Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT

for the

District of Columbia

_____ Division

| | |
|---|---|
| David W. Burkman, 40422-013 | Case: 1:21−cv−03338 |
| | Assigned To : Chutkan, Tanya S. |
| _Plaintiff(s)_ | Assign. Date : 12/14/2021 |
| _(Write the full name of each plaintiff who is filing this complaint._ | Description: Pro Se Gen. Civ. (F−DECK) |
| _If the names of all the plaintiffs cannot fit in the space above,_ | |
| _please write "see attached" in the space and attach an additional_ | |
| _page with the full list of names.)_ | |
| **-v-** | |
| Bureau of Prisons, Michael D. Carvajal, Kevin Kelley, | |
| Jane Doe, Ian Connors, Sean Marler, John Doe, | |
| Patricia Comstock, Karen Stiltner, Mitchel Holliday | |
| _Defendant(s)_ | |
| _(Write the full name of each defendant who is being sued. If the_ | |
| _names of all the defendants cannot fit in the space above, please_ | |
| _write "see attached" in the space and attach an additional page_ | |
| _with the full list of names. Do not include addresses here.)_ | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should _not_ contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include _only_: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---



RECEIVED
Mail Room
NOV 15 2021
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | David W. Burkman |
| All other names by which you have been known: | |
| ID Number | 40422-013 |
| Current Institution | FCI Danbury |
| Address | Route 37 |

| | | |
|---|---|---|
| Danbury | CT | 06811 |
| *City* | *State* | *Zip Code* |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Federal Bureau of Prisons |
| Job or Title *(if known)* | Federal Agency |
| Shield Number | |
| Employer | Department of Justice |
| Address | 320 First Street, NW |

| | | |
|---|---|---|
| Washington | DC | 20534 |
| *City* | *State* | *Zip Code* |

☐ Individual capacity    ☑ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Michael D. Carvajal |
| Job or Title *(if known)* | Director of the Bureau of Prisons |
| Shield Number | |
| Employer | Federal Bureau of Prisons |
| Address | 320 First Street, NW |

| | | |
|---|---|---|
| Washington | DC | 20534 |
| *City* | *State* | *Zip Code* |

☐ Individual capacity    ☑ Official capacity

I. (B) The Defendant's
Continued

Defendant No. 5
    Name                      Ian Connors
    Job or Title          National Inmate Appeals Administrator

    Shield Number
    Employer            Department of Justice/Office of General Counsel
    Address              320 First Street, N.W.
                            Washington, DC  20534

☐ Individual Capacity  ☑ Official Capacity

Defendant No. 6
    Name                      Sean Marler
    Job or Title          Current: Warden, Federal Detention Center Philadelphia
                            Ex-Acting Regional Director of Northeast Region on June 1, 2016

    Shield Number
    Employer            Department of Justice
    Address              700 Arch Street
                            Philadelphia, PA  19106

☐ Individual Capacity  ☑ Official Capacity

Defendant No. 7
    Name                      John Doe
    Job or Title          Administrative Remedy Coordinator/Northeast Region
    Shield Number
    Employer            Department of Justice
                            Federal Bureau of Prisons Northeast Regional Office
    Address              U.S. Customs House, 7th Floor
                            200 Chestnut Street
                            Philadelphia, PA  19106

☐ Individual Capacity  ☑ Official Capacity

Defendant No. 8
    Name                    Patricia Comstock
    Job or Title            Unknown currently
                           Ex- Associate Warden of FCI Danbury until April 2021
    Employer           Federal Bureau of Prisons
    Shield Number
    Address              Northeast Regional Office
                           U.S. Customs House, 7th Floor
                         200 Chestnut Street
                         Philadelphia PA  19106

☐ Individual Capacity     ☑ Official Capacity

Defendant No. 9
    Name                    Karen Stiltner
    Job or Title            Administrator National Food & Farm Services
    Employer           Federal Bureau of Prisons
    Shield Number
    Address              320 First Street, NW
                         Washington, DC  20534

☐ Individual Capacity     ☑ Official Capacity

Defendant No. 10
    Name                    Lt. Comdr. Mitchel Holliday
    Job or Title            Chief Dietician
    Employer           Federal Bureau of Prisons
    Shield Number
    Address              USPHS, Federal Bureau of Prisons
                         Attn:  Chief Dietician
                         2110 East Center Street
                         Rochester, MN  55904

☐ Individual Capacity     ☑ Official Capacity

Defendant No. 3

| | |
|---|---|
| Name | Kevin Kelley |
| Job or Title *(if known)* | Chief Chaplaincy Administrator |
| Shield Number | |
| Employer | Federal Bureau of Prisons |
| Address | 320 First Street, NW |

| Washington | DC | 20534 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☐ Individual capacity   ☑ Official capacity

Defendant No. 4

| | |
|---|---|
| Name | Jane Doe |
| Job or Title *(if known)* | Regional Chaplaincy Administrator of NE Region |
| Shield Number | |
| Employer | Federal Bureau of Prisons |
| Address | NE Reg. Off., US Customs House, 7th Floor 200 Chestnut St. |

| Philadelphia | PA | 19106 |
|---|---|---|
| *City* | *State* | *Zip Code* |

☐ Individual capacity   ☑ Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☑ Federal officials (a *Bivens* claim)

☐ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

N/A

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Free Exercise Clause of First Amendment Equal Protection Claims of Fifth and Fourteenth Amendments.

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

See attached Complaint for Claims for Relief

## III. Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- ☐ Pretrial detainee
- ☐ Civilly committed detainee
- ☐ Immigration detainee
- ☐ Convicted and sentenced state prisoner
- ☑ Convicted and sentenced federal prisoner
- ☐ Other *(explain)*

## IV. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. If the events giving rise to your claim arose outside an institution, describe where and when they arose.

N/A

B. If the events giving rise to your claim arose in an institution, describe where and when they arose.

FCI Danbury, 2016 to Present

C.      What date and approximate time did the events giving rise to your claim(s) occur?

2016 to Present

D.      What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

See attached Complaint for Facts

## V.      Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

N/A

## VI.      Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

See attached Complaint for Relief Requested

## VII.   Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Federal Bureau of Prisons, Federal Correctional Institution Danbury, Danbury, Connecticut

B.   Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C.   Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

All claims covered by the grievances filed.

D.   Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

[✓] Yes

[ ] No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

[ ] Yes

[ ] No

E.   If you did file a grievance:

1.   Where did you file the grievance?

FCI Danbury, Danbury, Connecticut;  NE Regional Office, Philadelphia, Pennsylvania; and Central Office, Washington, D.C.

2.   What did you claim in your grievance?

Failure to respond to officially filed and unofficial requests for religious accommodations.

3.   What was the result, if any?

Wait for a response at institutional level despite no response past deadline.

4.   What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

Appealed at Regional and National levels.  Both stated must wait for a response at institutional level despite the deadline per BOP policy and that per such policy a non-response was to be considered a denial at that level.  Still no response years later.

F.  If you did not file a grievance:

    1.  If there are any reasons why you did not file a grievance, state them here:

       N/A

    2.  If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

       N/A

G.  Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

    See attached Complaint and attached Administrative Remedies.

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B.    If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

    1.    Parties to the previous lawsuit

        Plaintiff(s) _____

        Defendant(s) _____

    2.    Court *(if federal court, name the district; if state court, name the county and State)*

    3.    Docket or index number

    4.    Name of Judge assigned to your case

    5.    Approximate date of filing lawsuit

    6.    Is the case still pending?

        ☐ Yes

        ☐ No

        If no, give the approximate date of disposition. _____

    7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

C.    Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

☐ Yes

☑ No

D.      If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s)  _____

Defendant(s)  _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition  _____

7.   What was the result of the case?  *(For example:  Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

_____

## IX.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:     09/21/2021

| | |
|---|---|
| Signature of Plaintiff | *David Burk* |
| Printed Name of Plaintiff | David W. Burkman |
| Prison Identification # | 40422-013 |
| Prison Address | FCI Danbury, Route 37 |

| | | |
|---|---|---|
| Danbury | CT | 06811 |
| *City* | *State* | *Zip Code* |

### B.     For Attorneys

Date of signing:

| | |
|---|---|
| Signature of Attorney | |
| Printed Name of Attorney | |
| Bar Number | |
| Name of Law Firm | |
| Address | |

| | | |
|---|---|---|
| | | |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| Telephone Number | |
| E-mail Address | |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA



DAVID W. BURKMAN 40422-013
FCI DANBURY
ROUTE 37
DANBURY, CT  06811

                    *Plaintiff*     Civil Case No. _____

    -V-

BUREAU OF PRISONS, MICHAEL D.
CARVAJAL, KEVIN KELLEY, JANE DOE,
JOHN DOE, IAN CONNORS, SEAN
MARLER, PATRICIA COMSTOCK,
KAREN STILTNER, CMDR. MITCHEL
HOLLIDAY

                  *Defendants*

COMPLAINT AFFIDAVIT

    State of Connecticut)
             )Affidavit of David W. Burkman
    County of Fairfield)

David W. Burkman, being first duly sworn, deposes as follows:
ALL statements by affiant contained within the complaint are true and correct.

DATED this the _21_ day of _September_ 20_21_.

                            _David Burk_
                            Signature of Affiant

SWORN to subscribed before me, this _21st_ day _September_ 20_21_

                          _Derek_
                          Notary Public

               My Commission Expires_____

                         **DEREK LAWN**
                         **NOTARY PUBLIC**
                     **State of Connecticut**
                   **My Commission Expires**
                      **May 31, 2024**

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID W. BURKMAN 40422-013**<br>**FCI DANBURY**<br>**ROUTE 37**<br>**DANBURY, CT 06811**<br><br>*Plaintiff*<br>**-V-**<br>**BUREAU OF PRISONS, MICHAEL D.**<br>**CARVAJAL, KEVIN KELLEY, JANE**<br>**DOE, JOHN DOE, IAN CONNORS,**<br>**SEAN MARLER, PATRICIA**<br>**COMSTOCK, KAREN STILTNER,**<br>**CMDR. MITCHEL HOLLIDAY**<br><br>*Defendants* | **Civil Case No.** _____ |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff complaint as follows:

### I. Introduction

1. This is a civil rights action filed by David W. Burkman #40422-013, an inmate in the Danbury Federal Correctional Institution, Danbury, Connecticut, for declaratory and injunctive relief under the Religious Freedom Restoration Act (RFRA), 42 U.S. Code § 20000bb-1 et seq., alleging the Bureau of Prison's violation of the Free Exercise Clause of the First Amendment for continued failing to accommodate sincerely held beliefs and practices of the plaintiff's faith group as well as violating the Equal Protection Clause of the Fifth and Fourteenth Amendments by failing to accommodate certain religious practices and provisions that are similar in nature as those already provided for other inmate religious groups within the Bureau of Prisons.

**Jurisdiction**

2.  The court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 42 U.S. Code § 1331 and 42 U.S. Code1343.

**III. Parties**

3. The Plaintiff, David W. Burkman, is incarcerated at Federal Correctional Institution Danbury and there during the events described in this complaint.

4. The Defendant Bureau of Prisons, is a federal agency responsible for housing federal inmates and providing them legally adequate housing, medical attention, and nutrition, as well as, accommodating inmate's religious beliefs and practices through the least restrictive means, is sued in official capacity.

5.  Defendant Michael D. Carvajal is the current Director of the Federal Bureau of Prisons (BOP), as well as in some of the events described in this complaint, was the Assistant Director for the Correctional Programs Division.  Prior to that, Mr. Carvajal was the Regional Director of the Northeast Region. As Director of the BOP, he is responsible for overseeing the operation of all BOP facilities, regional offices, and training centers with oversight and management of all BOP Staff and inmates.  As Assistant Director of Correctional Programs Division, he was responsible for a wide variety of areas, including inmate transportation, national policy direction, and daily operational oversight of institutions correctional services.  As Regional Director of the Northeast Region, he was responsible for overseeing the operations of the BOP's northeast region's facilities, oversight and management of the BOP's northeast region's employees and inmates.  He was also responsible in this regional director role for signing off on all Regional Administrative Remedy Appeals (BP-10's) responses. He is sued in his official capacity.

6.  Defendant Kevin Kelley is Chief Chaplaincy Administrator and is responsible for the oversight and management of BOP Chaplaincy Services nationwide. He is consultant to the Director of the BOP in matters of correctional chaplaincy. He is responsible for the administration, development, implementation, and evaluation of all aspects of religious ministry within the BOP nationwide. He is sued in his official capacity.

7.  Defendant Jane Doe is Regional Chaplaincy Administrator for the Northeast Region and is responsible for the oversight and management of Chaplaincy Services for all BOP facilities in the BOP northeast region. She is consultant to the Regional Director of the Northeast Region on matters of correctional chaplaincy.  She is responsible for the administrative development, implementation, coordination, and evaluation of all aspects of religious ministry for each institution within the northeast region. She is sued in her official capacity.

8.  Defendant Ian Connors is the National Inmate Appeals Administrator and is responsible for responses to inmate's Central Office Administrative Remedy Appeals (PBP11's). He is sued in his official capacity.

9.  Defendant Sean Marler was the Acting Regional Director for the Northeast Region during certain events in this complaint. As the Acting Regional Director of the Northeast Region, Mr. Marler was responsible for overseeing the operations of the BOP's northeast region's facilities, oversights, management of the BOP's northeast region employees and inmates.  He was also responsible for signing off on all Regional Administrative Remedy Appeals (BP-10's) responses. He is sued in his official capacity.

10. Defendant John Doe is the Regional Administrative Remedy Coordinator of the BOP Northeast Region. He is responsible for reviewing and responding to Regional Administrative Remedy Appeals (BP-10's) for the BOP's Northeast Region.  He is sued in his official capacity.

11. Defendant Patricia Comstock was Associate Warden at the Federal Correctional Institution Danbury during certain incidents in this complaint. She was responsible for oversight and management of the institution's programs, including Chaplaincy Services, Food Services, and Commissary Trust Fund. She is sued in her official capacity.

12. Defendant Karen Stiltner is BOP National Food Service Administrator. She is responsible for leading the Central Office Food Service team, policy development, providing technical supervision, menu development and responding to Congressional, commercial, and individual correspondence. She is sued in her official capacity.

13. Defendant Cmdr. Mitchel Holliday is BOP Chief Dietician. He is responsible for nutritional management of the BOP National Menu and is the BOP's senior subject matter expert on clinical and public health nutrition policies and guidelines. He is sued in his official capacity.

### IV. Exhaustion of Remedies

14. Plaintiff has exhausted all administrative remedies before filing this complaint.

### V. Factual Statement

### Religious Dietary Restrictions

15. On February 9, 2016, the plaintiff arrived at Federal Correctional Institution Danbury, Danbury, Connecticut.

16. On February 10, 2016, the plaintiff began receiving meals per his stated sincerely held religious dietary restrictions.

17. On February 11, 2016, the plaintiff was told by FCI Danbury's Assistant Food Service Administrator (AFSA), Mrs. McGetigan, that she would be instructing the FCI Danbury Health Services Administrator, Mr. Daley, to "pull" the plaintiff's dietary accommodations. Yet, Mrs. McGetigan, told the plaintiff that if he was lying about his claims and dropped the issue,

officially then she could accommodate the plaintiff unofficially as she states she does for other inmates who work for her.

18. Plaintiff re-affirmed to AFSA McGetigan that the plaintiff was not lying and that such religious dietary restrictions were sincere and factual.

19. On February 27, 2016, HSA Daley tells the plaintiff that the plaintiff is "playing them" despite plaintiff's continued plans to the contrary.

20. On February 28, 2016, the plaintiff's dietary accommodations are "pulled" (revoked) by HSA Daley per AFSA McGetigan's insistence.

21. Plaintiff confronts HSA Daley and AFSA McGetigan together and they confirm the dietary accommodations are "pulled" and refuse to discuss the matter further while laughing when the plaintiff walks away.

22. On March 24, 2016, at 1:30 p.m., Staff Chaplain Gordish interviews plaintiff for possible participation in the Alternative Diet Program.

23. Mr. Gordish approves plaintiff for the mainline component of the Alternative Diet Program, but per Mr. Gordish, plaintiff will actually be provided with a styrofoam tray with food that would accommodate the plaintiff's religious dietary restrictions since, per Mr. Gordish, neither of the two components of the Alternative Diet Program meets plaintiff's religious dietary restrictions and that such a meal would be available beginning at this day's (March 24, 2016) evening meal at the latest.

24. Food Service staff inform the plaintiff at the lunch and dinner meals that they have no paperwork yet regarding plaintiff's accommodations.

25. On March 25, 2016, Plaintiff then meets with Staff Chaplain Gordish at 6:30 p.m. because Food Service staff are stating they have received no notice from Chaplaincy Services

nor is plaintiff on the Certified Religious Diet Roster, therefore Food Services staff will not provide the plaintiff meals per plaintiff's religious dietary restrictions.

26. Mr. Gordish tells the plaintiff that all the paperwork is signed, processed, and that staff for all relevant departments should already have the paperwork and would speak with the Food Services staff the next day.

27. On March 26, 2016, at the lunch meal, Food Services staff attempt to give the plaintiff a Certified Religious Diet meal containing meat despite plaintiff not being approved for that component (the two components of the Alternative Diet Program are Mainline Self-Select Component and the other being Certified Religious Diet Component) and not being per plaintiff's stated religious dietary restrictions.

28. The plaintiff refuses to accept the meal and tells the Food Service staff that Staff Chaplain Gordish stated that the plaintiff was to be accommodated per plaintiff's religious dietary restrictions and informed the Food Service staff of these restrictions.

29. Plaintiff further informs the Food Service staff that they should have received the paperwork that, per Chaplain Gordish, Food Service staff was sent on this matter.

30. Food Service staff tell the plaintiff that they never received any such paperwork, and that Food Service does not offer vegetarian options to accommodate the plaintiff, despite that the same Food Service Department is officially accommodating inmate Michael Norwood #06970-014 of the Nation of Islam faith group with specially prepared Halal Vegetarian meals.

31. At 11:25 a.m. to 11:35 a.m., plaintiff spoke to Staff Chaplain Gordish about the matter.

32. Staff Chaplain Gordish told the plaintiff that he will be talking to Food Service Administrator Rogers and Health Services about protein concerns with such a lacto-vegetarian diet the plaintiff is requesting per his sincerely held religious dietary restrictions.

33.  At the evening meal at 5:30 p.m., the inmate diet cook, Jay Walden, refuses to give plaintiff a lacto-vegetarian tray while doing so for inmate Michael Norwood #06970-014.

34.  On March 29, 2016, plaintiff files an informal resolution stating his religious dietary restrictions are not being accommodated and sets out what those restrictions are.  Plaintiff further states that Food Service staff fail to accommodate plaintiff and that the Bureau of Prisons has officially only two religious dietary options and neither option accommodates plaintiff's sincerely held religious dietary restrictions.

35.  On March 30, 2016, at 6:30 a.m., AFSA McGetigan gives plaintiff the informal resolution response, but refuses to sign it after plaintiff asks her whose response this was and if it was FSA Roger's response since it was unsigned.

36.  AFSA McGetigan tells plaintiff that the response is the only response the plaintiff is getting and was as good as if it was FSA Rogers and, "FSA Rogers doesn't handle this shit" and tells plaintiff to quit harassing her over the matter stating, "you're not going to get over on this one".

37.  AFSA McGetigan responded to the informal resolution stating that the plaintiff is only approved for the self-selection component of the Certified Religious Diet Program and that such entitles plaintiff to select what he can eat during mainline.  Further, AFSA McGetigan states plaintiff is not entitled to anything extra nor is plaintiff approved for the Certified Religious Diet component while further stating those are the only two options available to the plaintiff.

38.  As plaintiff was at the time in the residential psychology program SKILLS for plaintiff's autism and life skills, plaintiff spoke to the SKILLS Coordinator, Dr. Caverly, about AFSA McGetigan's behavior and plaintiff asked Dr. Caverly how plaintiff should handle the situation.

39. The plaintiff proceeds to file a Request for Administrative Remedy (BP-9) at 12:10 p.m. with Counselor Bidwell.

40.  On April 7, 2016, the BP-9 was rejected because AFSA McGetigan did not properly respond on the informal resolution form since she attached the response to the form but refused to write on the informal resolution form and failed to sign it.

41.  Counselor Bidwell had plaintiff go to Food Service at 2:30 p.m. to get AFSA McGetigan's signature on a notepad at least stating that Food Service had given a response to the informal resolution since AFSA McGetigan still refused even Mrs. Bidwell to write anything in the informal resolution form nor sign it.

42. Plaintiff then re-files the BP-9 with Counselor Bidwell.

43.  On April 27, 2016, plaintiff receives response to the BP-9 dated April 26, 2016.  Warden D.K. Williams replied that there is no policy allowing for modification of the religious common fare diet and that the plaintiff can choose the no-flesh option (which is not lacto-vegetarian but instead is lacto-ovo vegetarian and is served on mainline with equipment that does not meet plaintiffs sincerely held religious dietary restriction as outlined in the informal resolution and BP-9).  Accordingly, plaintiff's request for Administrative Remedy is denied.

44.  Plaintiff files a regional Administrative Remedy Appeal (BP-10), through the prison facilities mailroom, to regional headquarters in Pennsylvania stating, "No flesh option still does not meet my religious requirements".  "Nor does the self-select nor certified options. Therefore, I am not satisfied with response by warden and her staff."

45.  On June 7, 2016, plaintiff receives in the mail the BP10 response dated June 1, 2016. Acting Regional Director, Sean Marler, quotes the Religious Beliefs and Practices program statement that, "the Bureau provides inmates requesting a religious diet reasonable and equitable

opportunity to observe their religions dietary practices within constraints of budget limitations and the scrutiny and orderly running of the institution and the Bureau through a religious diet menu." Mr. Marler further quotes, "The inmates interview responses well determine which component of the religious diet programs best accommodates his or her religious dietary needs." Mr. Marler states that the plaintiff was, "appropriately assigned to the mainline component of the religious diet based on your [plaintiff's] stated needs, which includes access to a no flesh option for every meal. Accordingly, your request is denied."

46. On June 12, 2016, plaintiff mails, through the prison facilities mailroom, a Central Office Administrative Remedy Appeal (BP-11) to the BOP headquarters in Washington, D.C.

47. Within the BP-11, the plaintiff states the issues with the mainline component and that, "the Warden and Acting Regional Director entirely ignored the other religious diet requirements of my [plaintiff] requests." Plaintiff further states that the requested diet is not merely vegetarian in nature and that plaintiffs sincerely held religious dietary restrictions are similar in how Kosher food must be handled. Plaintiff mistakenly quotes Religious Land Use and Institutional Persons Act (RLUIPA) instead of RFRA, although similar in scope. Plaintiff states here, "self-selection from mainline is impossible", due to plaintiff's sincerely held religious dietary restrictions. Plaintiff further explains PS5360.09 Religious Beliefs and Practices program statement is adequate for accommodating plaintiff's religious dietary restrictions and how despite such policy the plaintiff's dietary restrictions were met before with little to no extra expense. Plaintiff alleges at least one inmate at FCI Danbury is officially getting a specially prepared vegetarian diet as well as inmate kitchen workers being accommodated unofficially to meet their religious dietary beliefs with the blessings of Food Service staff. Plaintiff quotes RLUIPA and states the

existence of cases supporting inmates sincerely held religious dietary restrictions and that in denying such accommodations is unconstitutional.

48.  On July 6, 2016, at 8:30 a.m., plaintiff seeks Counselor Bidwell's help with checking status of the filed BP-11 since plaintiff has had no response nor receipt stating Central office received the form.

49.  Counselor Bidwell told plaintiff she will contact FCI Danbury's Administrative Remedy Coordinator to check with the Central Office's Administrative Coordinator, Ian Connors, on the matter.

50.  On July 13, 2016, at 12:00 p.m. Counselor Bidwell tells plaintiff she still has no response on the status of the BP-11.

51.  On July 15, 2016, at 2:30 p.m., plaintiff checks with Counselor Bidwell and she tells the plaintiff still no response on the BP-11 matter and that she will be gone all the next week.

52.  On August 10, 2016, at 3:30 p.m. plaintiff checks with Counselor Bidwell on the status of the BP-11 matter.  Mrs. Bidwell tells plaintiff that the FCI Danbury Administrative Remedy Coordinator stated she has received no answer for the plaintiff because the National Inmate Appeals Administrator will not respond.

53. After waiting almost the maximum 50 days allotted per Program Statement 542.18, the plaintiff requests a second BP-11 form from Counselor Bidwell to re-file since no response is forthcoming from Central Office on the first BP-11 sent on June 12, 2016.

54.  On August 22, 2016, the plaintiff mails the second copy of the BP-11 through the prison facilities mailroom.  In the second BP-11, plaintiff states the no response on the first filing and this time plaintiff registers the second BP-11 mail envelope with the mailroom staff in their legal mail logbook so that there is a record of filing it a second time.

55.  On September 16, 2016, plaintiff checks with Counselor Bidwell to see if she ever got a response on the status of the first BP-11.  Mrs. Bidwell stated that she still had no response from Ian Connors.

56.  On September 23, 2016, plaintiff received the second filing of the BP-11 as rejected due to untimely filing despite the reason given by plaintiff for filing a second copy of the BP-11 and per Program Statement 542.17 stating, "Coordinators … should be flexible, keeping in mind that major purposes of the Program are to solve problems and be responsive to issues inmates raise, … consideration should be given to accepting a Request or Appeal … even though that submission may be somewhat untimely."

57.  Since Counselor Bidwell personally did not see plaintiff mail the first BP-11, she refused to provide the staff verification that plaintiff needed to appeal the rejection and therefore plaintiff was unable to exhaust the remedy process.

58.  However, another inmate also at FCI Danbury and of plaintiff's faith group, Justin Moore #08536-027, filed a BP-11 on the same matter regarding his religious dietary restrictions also being denied.  Inmate Moore sent his BP-11 through the prison facilities mailroom on December 7, 2016, and he did receive a response to this BP-11 finally on September 25, 2017, by National Inmate Appeals Administrator, Ian Connors. Mr. Connors responds stating, "BOP alternative religious diet provides a no-flesh option, as part of the mainline self-select process to address vegetarian needs.  Inmates can supplement their diets by purchasing vegetarian meals in the institution's commissary", and that, "Self-selecting the no flesh items from mainline is the best accommodation available to meet your stated needs."

59.  On October 26, 2016, at 9:16 a.m., plaintiff teleconferences with Chief Dietician Mitchel Holliday regarding dietary concerns.  Mr. Holliday tells the plaintiff that he is well aware of the

issues, but that Mr. Holliday is not part of the Chaplaincy Services and only acts as a consultant for them. Per Mr. Holliday, the no-flesh option if a big issue because it is not a lacto-vegetarian or vegan option. Mr. Holliday further states that due to the number of complaints, the no-flesh option should be changing soon. He stated he could not personally assist with the plaintiff's situation nor in fixing the policies of the BOP. He did state a program review was coming up soon and so I (plaintiff) should soon see a change.

60. On October 27, 2016, the new Supervisory Chaplain, Mr. Thompson, requests that the plaintiff fill out a New and Unfamiliar Religious Practices Questionnaire (BP-A0822) so as to allow staff to review and work on resolving some of the issues with accommodating the plaintiff's sincerely held religious beliefs and practices. Mr. Thompson is well acquainted with plaintiff's faith group as he had experienced similar issues with other inmates of plaintiff's faith group at FCI Petersburg in Virginia before coming to FCI Danbury.

61. On October 28, 2016, at 11:50 a.m., the plaintiff gives Supervisory Chaplain Thompson a copy of the BP-A0822. Mr. Thompson tells the plaintiff that the plaintiff will have a response to all of it no later than February 28, 2017. (Plaintiff never received a response as promised).

62. On December 22, 2016, per Supervisory Chaplain Thompson's request, the plaintiff speaks with Mr. Thompson about plaintiffs sincerely held religious dietary restrictions, Holy Days, Fast Days, religious personal property, etc., as a follow-up question session to the filing of the BP-A0822. Mr. Thompson tells the plaintiff to check back with him in a few weeks and that Mr. Thompson should have it all resolved for the plaintiff and others of plaintiff's faith group.

63. On January 12, 2017, Supervisory Chaplain Thompson tells plaintiff that plaintiff nor others of plaintiff's faith group at FCI Danbury will be accommodated with their sincerely held religious dietary restrictions nor will plaintiff or others of his faith group receive any other

accommodations per the Regional Chaplaincy Administrator for the Northeast Region, defendant Jane Doe.

64.  On January 20, 2017, plaintiff receives his requested medical weight chart, but only the time period of May 21, 2015, to February 16, 2016, is given. During these nine months, the plaintiff lost 20.9 pounds, from 188.9 pounds to 168 pounds.  Staff stopped the chart shortly after plaintiff's arrival at FCI Danbury and plaintiff's stating his concern of weight loss to medical staff due to lack of dietary accommodations, including during transit.  (Plaintiff measures 6 foot 2 inches tall and recommended weight for that height is 182 to 222 pounds).

65.  On March 2, 2017, plaintiff asks Supervisory Chaplain Thompson about the status of the BP-A0822 reminding Mr. Thompson of his promised response by February 28, 2017.  Mr. Thompson tells plaintiff that Mr. Thompson has had no response to the BP-A0822 from Central Office as of yet.

### Certified Religious Diet Granted/
### Prohibited Items in CRD/CRD Revoked

66.  On April 16, 2017, Supervisory Chaplain Thompson requested that the plaintiff send a paper Request to Staff Form to Mr. Thompson requesting a religious diet accommodation interview again.

67.  Plaintiff, that afternoon, gives Supervisory Chaplain Thompson a paper Request to Staff Form asking for a religious diet interview.

68.  On April 17, 2017, in the morning, plaintiff meets with Supervisor Chaplain Thompson for an intensive, multi-hour interview regarding plaintiff's beliefs and practices of plaintiff's faith.  Mr. Thompson found plaintiffs beliefs and practices sincerely held and places plaintiff on Certified Religious Diet component of the Alternative Diet Program while further stating to

plaintiff that plaintiff's sincerely held religious dietary restrictions are noted and will be accommodated by Food Services and will be provided starting no later than the evening meal that day.

69. On April 19, 2017, at 3:23 p.m., the plaintiff sends an Electronic Request to Staff to Supervisory Chaplain Thompson stating Food Service still had not accommodated plaintiff's sincerely held religious dietary restrictions. Food Service staff are claiming plaintiff is not on the CRD roster nor do they have any special instructions in regard to plaintiff's sincerely held religions dietary restrictions despite plaintiff alleging he gave a typed declaration of such from plaintiff's outside community faith group to Supervisory Chaplain Thompson. Therefore, plaintiff requests if Mr. Thompson could look into the matter.

70. On April 20, 2017, at 8:15 a.m. plaintiff went to chapel to speak with Supervisory Chaplain Thompson about the Certified Religious Diet and the sincerely held religious dietary restrictions. Mr. Thompson stated he will meet with FSA Rogers to express the sincerity of the request and also suggested the plaintiff should meet separately with FSA Rogers on plaintiff's own initiative as well.

71. At 10:00 a.m., plaintiff asks the plaintiff's living unit correctional officer, Mr. Banks, if he can radio FSA Rogers. Mr. Banks gets no response but tells plaintiff to go over to Food Services and see if plaintiff can find FSA Rogers.

72. Plaintiff went over to Food Service, but never saw FSA Rogers.

73. At lunch, the inmate diet cook, Jay Walden, gave the plaintiff a Vegan Chili Meal Mart CRD entrée stating it was okay despite plaintiff's concern of possibly containing prohibited items per plaintiff's religious beliefs. Plaintiff, therefore, did not eat the entrée.

74.  At 12:00 p.m. plaintiff went with another inmate of plaintiff's faith group, Justin Moore #08536-027, to the Chapel for that inmate's religious diet interview until 1:34 p.m. with Supervisory Chaplain Thompson per request by Mr. Thompson.  Mr. Thompson places inmate Moore on the CRD component of the Alternate Diet Program.

75.  At dinner, plaintiff finally gets the ingredient list plaintiff requested from the inmate diet cook, Jay Walden, for the Vegan Chili and Vegetarian Cabbage Meal Mart hot entrees, which were two of the three meals approved at time for plaintiff.  Plaintiff had requested ingredient lists from all three meals but never got the third.  Both entrée ingredient lists showed they contained prohibited items per plaintiff's sincerely held religious dietary restrictions.

76.  The inmate diet cook, Jay Walden, then tried to give plaintiff another Vegan Chili Meal Mart hot entrée, but the plaintiff refused again, and they argued over the matter.  The inmate diet cook, Jay Walden, told the plaintiff that the plaintiff would need to talk to FSA Rogers the next day at 7:30 a.m. as the inmate diet worker stated he was only following orders.

77.  At 6:56 p.m. the plaintiff sent an Electronic Request to Staff to Supervisory Chaplain Thompson and Staff Chaplain Gordish stating the receipt of two of the three ingredient lists, the prohibited items contained in each, and that the plaintiff would try to speak to FSA Rogers the next day.

78.  At 7:10 p.m. the plaintiff sent an Electronic Request to Staff to FSA Rogers stating plaintiff is one of, "two Gaudiya Vaishnava (Hindu) in the compound that are now under the Certified Religious Diet Program to accommodate my religious tenets."  Plaintiff further explains what plaintiffs sincerely held religious dietary restriction are and that Supervisory Chaplain Thompson was given said tenets during the religious diet interview and that Mr. Thompson told plaintiff that Mr. Thompson sent a copy of the tenets to FSA Rogers as well as

the Food Service special diet inmate workers.  Plaintiff further alleges that Mr. Thompson spoke

with FSA Rogers and that Mr. Thompson told the plaintiff that FSA Rogers would accommodate

such tenets.  Plaintiff explains the issue of the prohibited ingredients in the entrees given and

plaintiffs attempts to contact FSA Rogers in person as well as plaintiff's intention to attempt to

meet FSA Rogers the next day.

79.  On April 21, 2017, at lunch, no CRD meal is available for plaintiff – only mainline,

which plaintiff refuses.  Plaintiff speaks with Food Service Officer, Mr. McNeese, on the matter

and Mr. McNeese attempts to contact FSA Rogers by telephone and radio but gets no response.

80.  Plaintiff then speaks with Warden D.K. Williams at 11:00 a.m. and she tells plaintiff to

go find Assistant Warden (AW) Pollard or FSA Rogers.

81.  Plaintiff looks for FSA Rogers and AW Pollard until 11:50 a.m. but to no avail.

82.  Since plaintiff was still living in the SKILLS residential psychology program unit,

plaintiff spoke with SKILLS Coordinator, Dr. Caverly, on the matter and Dr. Caverly stated he

would speak to AW Pollard on the matter.

83.  At 12:05 p.m. plaintiff spoke with Counselor Bidwell also about the situation as she had

requested to be kept up to date on the matter.

84.  Food Service Officer Kimmel told Food Service Officer Lewis to tell Counselor Bidwell

that the situation is a medical issue and plaintiff needed to see Health Services about the diet.

85.  Counselor Bidwell copies the plaintiff's Notification of Religious Diet Accommodations

Form (BP-A0700) that approved plaintiff for CRD and sent an email to Food Services and to

Correctional Executive Officer Kohrs on the matter.

86.  At 1:08 p.m. to 1:13 p.m., the plaintiff spoke to Dr. Caverly on the matter.  Dr. Caverly

also copied plaintiff's BP-A0700 and the copies of the Electronic Requests to Staff plaintiff sent

to Supervisory Chaplain Thompson and FSA Rogers that day as well as plaintiff's Declaration of Tenets from plaintiff's outside community faith group stating the plaintiff's religious dietary restrictions.

87.  At 2:00 p.m., Dr. Caverly left his office in the SKILLS living unit to go see AW Pollard and see if she would talk with the plaintiff on the matters.

88.  At 2:30 p.m., Dr. Caverly came back to the SKILLS living unit and told the plaintiff, "AW Pollard stated to eat off the salad bar".

89.  Counselor Bidwell finds plaintiff in the SKILLS living unit and tells the plaintiff that Mrs. Bidwell was told by FSA Rogers that the proper meal will be there at the chow line tonight at dinner.  Mrs. Bidwell told the plaintiff to come to the chow hall and pick it up as this was Mrs. Bidwell's late night that week and so she will be at mainline in the chow hall if there is any problem.

90.  Plaintiff goes to the chow hall and the Food Service staff tried again to give the plaintiff the Vegetarian Cabbage Meal Mart CRD hot entrée, even though Food Service staff had already been told that it contains prohibited items per plaintiff's sincerely held religious dietary restrictions.

91.  Counselor Bidwell tries to argue the issue with the Food Service staff as well, but the Food Service staff tells Mrs. Bidwell and the plaintiff that the Vegetarian Cabbage Meal Mart CRD hot entrée was specifically what they were told to give the plaintiff per FSA Rogers and nothing else.  So, plaintiff leaves again without a meal.

92.  At 7:03 p.m. the plaintiff sent an Electronic Request to Staff to FSA Rogers explaining plaintiffs attempts through various staff to contact FSA Rogers to no avail.  Plaintiff states that no meals per plaintiff's religious dietary restrictions was available again at the evening meal.

Plaintiff also states Counselor Bidwell's actions.  Plaintiff alleges Mr. Rogers stated to Supervisory Chaplain Thompson that Mr. Rogers would accommodate plaintiff's religious dietary restrictions as well as telling Mrs. Bidwell that an acceptable meal would be available for the plaintiff at the evening meal.  Plaintiff states that all he is receiving each day for food is one fruit, one packet of jelly, two packs of margarine, two slices of bread and nothing else for the rest of the day.  Plaintiff concludes by offering to, "sit down and speak with you (FSA Rogers) about the situation if need be".

93.  At 7:12 p.m., Counselor Bidwell came to plaintiff's cell and stated Food Service Officer Kimmel asked why the plaintiff did not tell him (Mr. Kimmel) that the plaintiff could have peanut butter and jelly. Mr. Kimmel said he will let his staff know as he will not be there the next day. Mrs. Bidwell told the plaintiff that she would also send Mr. Kimmel an email to remind him.

94.  On April 23, 2016, at 1:00 p.m., plaintiff speaks with Supervisory Chaplain Thompson on the CRD issue.  Mr. Thompson tells the plaintiff that Mr. Thompson will tell FSA Rogers again about the issue but was not going to fight for inmate Moore nor plaintiff on the matter.

95.  On April 24, 2017, at 11:32 a.m., plaintiff speaks to AW Pollard at the lunch mainline. Mrs. Pollard told the plaintiff that the plaintiff was misinformed, and that FSA Rogers cannot accommodate the plaintiff due to national policy forbidding anyone except the National Food Service Administrator, defendant Karen Stiltner, from adjusting the CRD menu.

96.  While leaving the chow hall, plaintiff also thanked FSA Rogers for at least trying to help.

97.  At 1:30 p.m., plaintiff saw Dr. Tindel of Health Services for regular checkup, and it was noted plaintiff was still only 172 pounds in weight.

98.  On April 25, 2017, at 12:00 p.m., AFSA McGetigan found the plaintiff and while smiling, stated she had talked to Central Office and they advised her, "to keep doing what they are doing."  She then walked away, and the plaintiff was confused at what she meant.

99.  On April 26, 2017, at the evening meal, the plaintiff was told by the inmate diet cook, Jay Walden, that the plaintiff CRD was "pulled" by regional, and that the plaintiff should speak to Supervisory Chaplain Thompson on the matter.

100.  Plaintiff again refuses the mainline meal due to it being against his sincerely held religious beliefs.

101.  At 7:32 p.m., the plaintiff sent an Electronic Request to Staff to Supervisory Chaplain Thompson on the situation and that the plaintiff would be at the chapel at 7:30 a.m. the next morning to speak with Mr. Thompson on the matter.  Plaintiff also claims the BOP staff knowingly are continuing to violate the plaintiff's religious rights by not accommodating plaintiff's sincerely held religious dietary restrictions (as personally verified by Supervisory Chaplain Thompson himself).

102.  On April 27, 2017, Supervisory Chaplain Thompson shows up at the chapel at 8:20 a.m. and inmate Moore and plaintiff are waiting there to speak with Mr. Thompson and Mr. Thompson does not speak with them until 9:30 a.m.  Mr. Thompson tells plaintiff that it was AFSA McGetigan who overstepped her chain of command and went directly to Chief Dietician, Mitchel Holliday, at the national level.  Mr. Holliday allegedly stated that a Chaplain cannot adjust CRD.  Mr. Thompson tells the plaintiff that AFSA McGetigan has significant personal issues with inmate Moore and especially with plaintiff for some reason and allegedly ranted on to Mr. Thompson about inmate Moore and plaintiff being insincere and allegedly many other things Mr. Thompson hinted at but refused to repeat.

103. Supervisory Chaplain Thompson tells the plaintiff that Mr. Thompson was informed by the Regional Chaplaincy Administrator for the Northeastern Region, Jane Doe, that CRD is only for inmates of the Jewish and Muslim faiths and that the plaintiff is advised to self-select from mainline.

104. At 11:13 a.m., the plaintiff speaks with AW Pollard at lunch mainline about the religious dietary issues as well as AFSA McGetigan's alleged behavior.  AW Pollard tells the plaintiff that she dislikes pettiness as much as the plaintiff does and that she will be talking to FSA Rogers on the matter.  AW Pollard asked that plaintiff come back at the lunch mainline the next day after 30 minutes of the start as AW Pollard also had to do mainline duty at the other facility the next day but will be by FCI Danbury to let plaintiff know what she finds out.

### Temporary One-A-Day Fast Bag Meal
### In Lieu of CRD/Self-Select

105. On April 28, 2017, plaintiff waited at mainline until 12:30 p.m. until everything was closed, and AW Pollard was unable to make an appearance.

106. At 12:38 p.m., plaintiff sent an Electronic Request to Staff to AW Pollard stating plaintiff's attempt to meet AW Pollard and that Unit Manager Kohrs told the plaintiff that AW Pollard had not made it back to the facility yet.  Plaintiff reminds AW Pollard of not having a meal available still and the upcoming weekend when administrative staff will not be able to rectify the issue.

107. At 1:30 p.m., plaintiff spoke with FSA Rogers and FSA Rogers stated, "Didn't you [plaintiff] speak to the Chaplain?"

108. FSA Rogers told plaintiff that FSA Rogers, "would do the PBJ (Peanut Butter and Jelly Sandwich items) thing."

109.   At 2:30 p.m., inmate Moore and plaintiff meet with Chaplain Gordish.  Mr. Gordish tells them that both have been officially removed from the CRD component of the Alterative Diet Program.

110.   At 3:30 p.m. plaintiff spoke with AW Pollard and she said, "she got it fixed" but the plaintiff would be painting the murals AW Pollard wanted in the visiting room in return.

111.   At the evening meal, the plaintiff got a sack bag diet that contained bread, jelly packets, and peanut butter packets.

112.   On April 30, 2017, at 2:05 p.m. and 2:07 p.m., the plaintiff sent an Electronic Request to Staff to AW Pollard and FSA Rogers respectively thanking them for the temporary fix.

113.   Plaintiff spoke with Supervisory Chaplain Thompson about plaintiff's removal from the CRD component.  Mr. Thompson told the plaintiff that Mr. Thompson was forced to "pull" inmate Moore and plaintiff from the CRD roster by orders from Regional Chaplaincy Administrator, defendant Jane Doe, and that defendant Jane Doe felt that self-select from mainline was correct for inmate Moore's and plaintiff's religious dietary needs.

114. On June 29, 2017, plaintiff attempted to pick up meal bag at breakfast time as usual. Food Service Officer, Mrs. Vermet, Unit Officer, Woodbury, and the Commissary Officer, McKnight stopped plaintiff outside the exit of the chow hall and Mrs. Vermet told the plaintiff that there is a new memorandum posted by Supervisory Chaplain Thompson listing which inmates can take out their meals from the chow hall.  The Muslim inmate, Michael Norwood of the Nation of Islam faith and those of the Jewish faith are listed.  Yet, those of the "Hindu" faiths were excluded.  Mrs. Vermet told the plaintiff, "Honey, you can quit arguing and just take that (pointing to the paper bag in the plaintiff's hand) and go eat it in the chow hall like everyone else does 'cause you don't have any reason to take it back to the unit and aren't going to be taking it

out of the chow hall. Period." (Plaintiff's sincerely held religious tenets require plaintiff to first

pray over the food at the plaintiff's altar before consuming the food and therefore it is necessary

for plaintiff to take food to his living unit).

115.  Plaintiff went back into the chow hall and returned the bag to the Food Service inmate

worker as Food Service Officer Vermet followed the plaintiff all the way, but then went to her

usual spot on the chow line when the plaintiff started walking away and left.  Normally, Mrs.

Vermet is running the two chow lines and is the assistant and friend to AFSA McGetigan.  For

some reason that morning Mrs. Vermet was posted outside the exit until she confronted the

plaintiff and then after following the plaintiff back to the chow line, returned to her usual post

between the chow lines once plaintiff returned the meal bag and began to leave.

116.  At 6:54 a.m., the plaintiff sent an Electronic Request to Staff to Supervisory Chaplain

Thompson explaining the current situation.  Plaintiff explains in detail why the plaintiff should

be allowed to take meals to the living unit per plaintiff's sincerely held beliefs and practices.

Plaintiff also alleges discrimination, and that plaintiff is without food.

117.  At 10:26 a.m. the plaintiff sends another Electronic Request to Staff to Supervisory

Chaplain Thompson.  Plaintiff alleges that some staff have been rebutting plaintiff's sincerity of

plaintiff's religious dietary beliefs and reasons for taking meals to the living unit.  So, the

plaintiff explains plaintiff beliefs and practices by quoting numerous scriptural references and

instructions on this specific matter from a greatly revered as well as an acknowledged scholar

and spiritual master of the plaintiff's faith.

118.  On June 30, 2017, plaintiff attempts to pick up plaintiffs once-a-day sack "meal".  Unit

Officer Woodbury and two other unit officers were waiting at the chow hall exit to pat inmates

down to check for contraband.  Inmate Moore, plaintiff and Mr. Woodbury get into a verbal

argument after plaintiff requests to speak to the on-duty Lieutenant since AW Pollard was

unavailable. Lt. Wassen came over and stated that he had spoken with AW Pollard and that for

now the answer was "no" on inmate Moore and plaintiff bringing their meals out of the chow

hall (despite accommodating inmates of other faiths in doing so) and that the plaintiff could talk

to AW Pollard at lunch mainline that day.

119. At 7:26 a.m., plaintiff sent Electronic Request to Staff to AW Pollard stating situation

and plaintiff's actions in attempting to rectify the issue.

120. AW Pollard was not at lunch mainline and plaintiff waited until everything was closed.

Plaintiff could not send an Electronic Request to Staff to AW Pollard because plaintiff had

exceeded the daily limit of requests allowed after, at 8:15 a.m., forwarding the two Electronic

Requests to Staff plaintiff sent to Supervisory Chaplain Thompson the day before so AW Pollard

could see plaintiff's efforts to rectify the matter.

121. Plaintiff gets an informal resolution form from Counselor Bidwell to file in the matter.

122. At 12:00 p.m., plaintiff went to the chapel looking for the new Staff Chaplain, Mr.

Connors, as Supervisory Chaplin Thompson was at this point under investigation for allegedly

bringing in contraband food for inmates of the Jewish faith group and therefore was not allowed

to speak with inmates. Instead, plaintiff spoke with Chapel Volunteer Coordinator, Mrs.

Castrovinci, informing her that the plaintiff was looking for Staff Chaplin Connors and informed

Mrs. Castrovinci of the meal situation. She told the plaintiff that Mr. Connors is at the facility

and would be back to the chapel shortly if plaintiff wanted to wait.

123. At 12:30 p.m., Staff Chaplain Connors shows up at the chapel and speaks with plaintiff

until 1:30 p.m. Mr. Connors read copies plaintiff provided of the Electronic Request to Staff the

plaintiff sent to the various involved staff on the meal issue and Mr. Connors talked at length

about the matter with inmate Moore and the plaintiff.  Mr. Connors concluded by telling plaintiff

that Mr. Connors would get back in contact with inmate Moore and the plaintiff before the

evening meal.

124.  Staff Chaplain Connors pages inmate Moore and the plaintiff to the chapel and gave

them temporary paper passes to be allowed to bring out meals from the chow hall.  The passes

are good through the weekend and expire on Monday at 9:00 a.m.

125.  On July 1, 2017, plaintiff is able to pick up and take out of the chow hall the one-a-day

bag at breakfast with no issues.

126.  At 8:07 a.m., plaintiff receives a response from Staff Chaplain Connors to the Electronic

Request to Staff of June 29, 2017.  Mr. Connors replies stating that plaintiff was given a

temporary memorandum for meals and a more comprehensive review will be conducted to

consider plaintiff's concerns.

127.  On July 2, 2017, plaintiff picks up once-a-day bag, but Food Service Officer Vermet is

visibly unhappy about the matter by using expressive body language and grumbling under her

breath to express her dissatisfaction.

128.  On July 3, 2017, Staff Chaplain Connors creates a memorandum for, "Will Rogers,

Food Service Administrator from Chaplin Connors", that placed inmate Moore and plaintiff as,

"additional FCI inmates to take food from Dining Hall".  The memorandum was also forwarded

to all FCI Danbury Lieutenants.

### New Memorandum Banning Meals Outside of Chow Hall
### & Revocation of Once-a-Day Bag "Meals"

129.  On September 1, 2017, plaintiff attempted to pick up the once-a-day bag.  Unit Officer

Woodbury again along with Unit Officer Pate were waiting at the chow hall exit and Mr.

Woodbury forbade the plaintiff from taking out the bag from the chow hall and told plaintiff to

turn around and take it back inside while simultaneously and knowingly allowing another inmate

to leave with an entire commissary cereal bag full of contraband milk.  After seeing such and the

past encounters over the meal issues with Mr. Woodbury, plaintiff argues with Mr. Woodbury

since it seems to the plaintiff that Mr. Woodbury is the specific officer posted right at the exit

every time a new memorandum on the rules for food affecting the plaintiff is posted and because

this time there is no posted copy on the rules nor can Mr. Woodbury produce a copy of such

when plaintiff asks for such proof.  Due to Mr. Woodbury's less than upstanding reputation

amongst the inmate population and his consistent involvement in denying the plaintiff

accommodations, plaintiff does not trust Mr. Woodbury's statements.

130.  The plaintiff refuses to obey Unit Officer Woodbury and therefore Mr. Woodbury radios

Lt. Hernandez to come since plaintiff is requesting to speak to a Lieutenant on the matter.

131.  Lt. Hernandez tells the plaintiff that there is indeed a memorandum, and it is not posted,

but they have orders that no one is to take out any food out of the chow hall.  Plaintiff shows

Mrs. Hernandez a copy of the memorandum permitting the plaintiff to bring out the once-a-day

bag "meal".  Mrs. Hernandez tells the plaintiff that this particular memorandum is no longer

worth the paper it is printed on.  Plaintiff therefore returns the once-a-day bag to the chow line

worker and leaves without any food.

132.  At 8:12 a.m., plaintiff sends an Electronic Request to Staff addressed to Staff Chaplain

Connors about the new memorandum stating in detail how much actual food is being given in the

once-a-day bag "meals" to plaintiff versus a larger quantity provided in official BOP policy Fast

bags provided to other faith groups per BOP program statements and that such Fast bags are still

allowed to be taken out of the chow hall.  Plaintiff therefore alleges discrimination.

133. At 12:30 p.m., plaintiff meets with Staff Chaplain Connors. Mr. Connors tells the plaintiff that Mr. Connors will update the memorandum forbidding all inmates to take out their meals from the chow hall to exclude plaintiff's faith group only as that new memorandum was not meant for the plaintiff's faith group but instead for the other faith groups that were in trouble.

134. Plaintiff stops by the chapel that evening and speaks with Staff Chaplain Connors. Mr. Connors stated he is working on the matter and will "email" plaintiff when fixed.

135. On September 4, 2017, at 1:52 p.m., Staff Chaplin Connors responded to the Electronic Request to Staff from September 1, 2017. Mr. Connors states that Religious Services will circulate a memorandum request for inmate Moore and plaintiff. Mr. Connors also thanked plaintiff for plaintiff's patience and stated, "we're getting there".

136. At 4:47 p.m., plaintiff replied to the Electronic Request to Staff response asking what Staff Chaplain Connors meant by "we're getting there". Plaintiff asks why the Muslim and Jewish communities (who allegedly, per staff, created the problem with contraband and also involving Supervisory Chaplain Thompson) were allowed to take out their meals on the same day inmate Moore and the plaintiff were forbidden to bring out once-a-day bag "meals" from the chow hall. Plaintiff also asks why on Labor Day the whole general inmate population could bring out their evening meals and take them back to their living units as done for all BOP recognized holidays, but inmate Moore and plaintiff could not do so with the once-a-day bags that contain less than those given to the general population evening meal that day. Plaintiff claims discrimination from certain staff.

137. On September 6, 2017, at 11:00 a.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors stating six days have passed without resolution to the meal

issue and that other faith groups are being accommodated in this matter and no staff are communicating with inmate Moore nor the plaintiff regarding the situation.

138.  At 11:34 p.m., plaintiff's parents sent an email to FCI Danbury's Executive Assistant stating plaintiff was not being allowed his religious diet, not being allowed to bring out food from chow hall, nor is Food Service making a sack bag.  Plaintiff's parents state that the plaintiff is a practicing Hindu serious about his religious tenets and has been seeking accommodations for his diet since entering the prison in 2016.  Plaintiff's parents state that Jewish and Muslim inmates are able to eat and be accommodated at a costly manner compared to the plaintiff. Plaintiff's parents accuse the BOP of violating plaintiff's religious rights.  Plaintiff's parents state how such inadequate accommodations have affected plaintiff's health and plaintiff getting an infection that, per the BOP doctor, was due to a lack of proper nutrition.  Plaintiff's parents also raise the religious rights violations as well.

139.  On September 9, 2017, in the evening, Staff Chaplain Connors gives inmate Moore and the plaintiff a sack "meal" each in their living unit.

140.  At 9:21 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors thanking Mr. Connors for temporarily resolving the meal issue.

141.  On September 10, 2017, in the evening, Staff Chaplain Connors gives inmate Moore and the plaintiff a sack "meal" each in their living unit.  Mr. Connors tells plaintiff that, "a more permanent solution is being sought".

142.  At 9:17 p.m. Staff Chaplain Connors responds to Electronic Request to Staff from September 9, 2017.  Mr. Connors responds stating "You're welcome.  We seek a permanent solution".

143. On September 12, 2017, at 6:18 p.m., plaintiff sends an Electronic Request to Staff addressed to Staff Chaplain Connors asking of status on progress of the meal situation and states the plaintiff is still unable to get a meal for second day in a row now.

144. On September 13, 2017, at 11:31 a.m., plaintiff's parents receive a response from their email sent to FCI Danbury's Executive Assistant on September 6, 2017, at 11:34 a.m. The FCI Danbury Executive Assistant responds alleging that the following information is provided by the Religious Services Department, "Mr. Burkman [plaintiff] has been in ongoing discussions with Religious Services staff regarding his dietary needs. His food situation was remedied on Saturday, September 9, and a further, more fixed solution has been found for his dietary needs, in consideration with Food Services staff … on agreed upon set of Holy Days is thought to have already been reached with Mr. Burkman [plaintiff].

145. On September 14, 2017, Suhag Shukla, the Executive Director of the Hindu American Foundation tells plaintiff's parents that Mrs. Shukla has a contact with the BOP and is looking into the matter on behalf of the plaintiff.

146. At 10:14 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors about email response to plaintiff's parents, no response from administration to plaintiff, plaintiff's dwindling supply of food purchased by plaintiff at commissary and alleging that the situation is affecting plaintiff's mental and physical health, and still no meals available to plaintiff per plaintiff's sincerely held religious dietary restrictions, beliefs, and practices.

147. On September 15, 2017, at 5:45 p.m., inmate Moore and the plaintiff are paged to the chapel to pick up sack "meals" from Staff Chaplain Connors.

148. On September 16, 2017, at 2:47 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors stating, according to inmate Moore, Food Service Officer

Hillman came into plaintiff's living unit while plaintiff was out at plaintiff's teaching job and Mr. Hillman went into plaintiff's locker in plaintiff's cell and took plaintiff's remaining items from that days sack "meal".

149.  That evening, plaintiff goes to the chapel and picks up the once-a-day sack meal from Staff Chaplain Connors.

150.  On September 17, 2019, plaintiff sends an Electronic Request to Staff at 6:49 p.m. to Staff Chaplain Connors asking if plaintiff needs to come by the chapel to pick up the bag meal and plaintiff thanks Mr. Connors for the "sack bag yesterday evening".

151.  On September 18, 2017, at 3:39 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors.  Plaintiff states no contact from Mr. Connors nor meals again and plaintiff asks if plaintiff can pick up a bag "meal" or asks if there are now other arrangements or none at all.

152.  On September 19, 2017, at 3:03 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Connors stating still no contact from Mr. Connors or administration nor meals for nineteen days save four and plaintiff summarized the situation and seriousness of the situation.

153.  On September 25, 2017, at lunch mainline, the plaintiff speaks with AW Pollard about the ongoing meal issue.  Mrs. Pollard told the plaintiff that the administrative staff had no issues with the plaintiff bringing out the sack "meals" from the chow hall.  Instead, Mrs. Pollard blames Staff Chaplain Connors and Food Services staff for the issues.  FSA Rogers was standing nearby and so plaintiff addressed Mr. Rogers about the issues.  Mr. Rogers acted as if he forgot the agreement to provide such sack "meals" and instead dismissed the plaintiff in front of AW Pollard. Plaintiff tells Mrs. Pollard that the plaintiff will talk with Mrs. Pollard tomorrow.

154. On September 26, 2017, at 11:15 a.m., plaintiff speaks with AW Pollard.  Mrs. Pollard told the plaintiff that Mrs. Pollard, "went all the way to the top to Central Office and their response was no accommodations are to be given and that inmates (inmate Moore and plaintiff) are to self-select out of the chow hall".  Mrs. Pollard told the plaintiff of the meeting with FSA Rogers, AFSA McGetigan and Staff Chaplain Connors on the matter.  Mrs. Pollard told the plaintiff that FSA Rogers had AFSA McGetigan contact Central Office on the matter and the decision not to accommodate was the result.

155. On September 27, 2017, at 2:12 p.m., plaintiff sent a final Electronic Request to Staff addressed to Staff Chaplain Connors (whom at this point was the Acting Supervisory Chaplain) on the sack bag "meals".  Plaintiff summarizes the situation, alleges violation of plaintiff's religious rights by staff from Central Office level down to the institutional level with Food Service Staff and Mr. Connors, himself.  Plaintiff accuses Mr. Connors of betraying the plaintiff's trust and the plaintiff states intention to stop trying to get Mr. Connors to communicate with the plaintiff.

## Holy/Fast Days

156. On April 30, 2017, at 1:49 p.m. and 2:02 p.m., plaintiff sent two Electronic Requests to Staff addressed to Supervisory Chaplain Thompson and to Staff Chaplain Gordish listing the remaining Holy/Feast days for 2017 for plaintiff's faith group.  The reason for this was that in March, Mr. Thompson told the plaintiff that Mr. Thompson was directed by the Religious Issues Committee at Central Office that Mr. Thompson should accommodate plaintiff's faith group's Holy/Fast days at the institutional level but would not at the national level.  Therefore, Mr. Thompson requested the plaintiff to send an Electronic Request to Staff addressed to Mr.

Thompson containing the remainder of the year's Holy/Fast Days so that Chaplaincy Services at FCI Danbury could key them into the computer system.

157.  On May 4, 2017, at 1:30 p.m., plaintiff speaks with Staff Chaplain Gordish on status of the Holy/Fast days sent through an Electronic Request to Staff on April 30, 2017.  Mr. Gordish tells the plaintiff that Supervisory Chaplain Thompson stated plaintiff is requesting too many Holy/Fast days and that the plaintiff needed to speak with Mr. Thompson on the matter.

158.  On May 5, 2017, at 8:07 p.m., the plaintiff sent an Electronic Request to Staff to Supervisory Chaplain Thompson. Plaintiff states Staff Chaplain Gordish told plaintiff that Mr. Thompson felt plaintiff requested Holy Days were too much.  Plaintiff explains in detail the difference of the current "common" calendar being of Christianity and not followed by those of plaintiff's faith, who uses a different calculation system based on the lunar calendar instead of solar calendar.  Plaintiff also compares the amount of Jewish, Catholic, and Christian Holy Days that are accommodated by the BOP versus plaintiff's requested days showing plaintiff is asking for a total of 41 days versus 58-64 days for the occidental faiths.  Plaintiff also offers supporting documentation to prove sincerity of the request, quotes BOP program statements on the matter, raises equal protection of rights, and offers verification through documentation, as well as contact information on outside community faith leaders that Mr. Thompson has already contacted on other matters.  Plaintiff accuses Mr. Thompson of discrimination and asks Mr. Thompson to please work with the plaintiff on the matter so it does not become an issue as the religious dietary restrictions has already become.

159.  On May 12, 2017, plaintiff files an informal resolution with Counselor Bidwell on the matter of Holy/Fast Days accommodations after Supervisory Chaplain Thompson fails to respond to plaintiffs attempts to resolve the issue.

160. On May 17, 2017, Supervisory Chaplain Thompson responds to the informal resolution. Mr. Thompson states plaintiff's number of Holy/Fast Days cannot be accommodated at the institutional level. "It would be a burden to the institution to be required to accommodate the amount of observance days you [plaintiff] mention."

161. On May 19, 2017, plaintiff files a Request for Administrative Remedy (BP-9) wherein plaintiff states informal resolution response is ambiguous and inadequate in addressing plaintiff's claim. Plaintiff states that the response does not state who advised Religious Services nor does the response state if any of the days will be accommodated nor does the response explain how such a request for the few of plaintiff's faith at the facility would create a burden upon the facility especially as plaintiff explains how plaintiff's request is less days than the number of Holy/Fast Days already accommodated by the BOP for other faith groups. Plaintiff also addresses the failure of BOP staff to effectively communicate with the plaintiff thereby forcing the plaintiff to file the Administrative Remedy requests.

162. On June 14, 2017, Warden D.K. Williams responds to plaintiff's BP-9 on Holy/Fast Days. Mrs. Williams responds stating plaintiff claims a bias against FCI Danbury Hindu inmate practitioners versus other religions because of disparity of Holy/Fast days. Quoting from Religious Beliefs and Practices program statement (PS5360.09), Mrs. Williams states, "a weekly ceremony/meeting is scheduled for Hindu inmates along with multiple Holy/Fast Days that are recognized." (The BOP currently recognizes two Holy Days a year and no fast days for inmates of the "Hindu" faiths).

163. On June 16, 2017, plaintiff files, through the prison facilities mailroom, to the regional office in Pennsylvania a Regional Administrative Remedy Appeal (BP-10) stating, "Warden's response failed to address the issues of the Vaishnavan community's recognized and observed

public fast days and holy days that are not being accommodated by BOP on a national (not just a local level) and responses thus far fail to address not only these important days, but that other religious groups have their important Fast and Holy Days accommodated on a national level. Therefore, responses thus far are inadequate".

164. On August 4, 2017, plaintiff receives in the mail the response to the BP-10.  On August 1, 2017, Regional Director, defendant M.D. Carvajal, quotes Religious Beliefs and Practices program statement (PS5360.09) and states that, "the warden adequately addressed the issues," yet states, "the institution has no control over national recognition and policy". Mr. Carvajal further states, "However, the Chaplaincy Services Department at your [plaintiff] institution has worked to ensure you [plaintiff] have appropriate local accommodations in light of available resources.  Because the needs of one religion cannot always be directly compared with the needs of a different religion, accommodations may vary. Accordingly, your [plaintiff] appeal is denied".

165. On August 13, 2017, plaintiff files, through the prison facilities mailroom, to BOP headquarters in Washington, D.C., a Central Office Administrative Remedy Appeal stating, "the regional response fails to address the disparity of recommendations for Hindu inmate's faith group versus other accommodations of other faith groups."  Plaintiff alleges, "the response does not adequately address nor rectify the lack of BOP accommodations for sincerely held beliefs of the Hindu faith group as expressed in the informal resolution paperwork."  Plaintiff states the issue needs to be addressed at the Central Office level through program statements as has been done for other faith groups.

166. On September 15, 2017, the plaintiff receives the BP-11 in the mail as rejected.  The BP-11 was rejected on September 6, 2017, by National Inmate Appeals Administrator, defendant

Ian Connors.  Mr. Connors alleges that plaintiff failed to provide a copy of the BP-10 and BP10 response despite both being in the still stapled together BP-11 packet plaintiff received in the mail from Mr. Connors.

167.  Plaintiff responds to the Rejection Notice stating, "Reply was included the first time. Rejection of this appeal on these grounds therefore is unfounded.  Please be more thorough and careful before issuing such a rejection."  Plaintiff then re-sent the BP-11 packet through the prison facility mailroom to BOP headquarters in Washington, D.C. again.

168.  On January 30, 2018, plaintiff received in the mail the response to the BP-11.  National Inmate Appeals Administrator, defendant Ian Connors, responded to the BP-11 on January 8, 2018.  Mr. Connors states, "concur with the manner in which the Warden and Regional Director addressed your [plaintiff] concerns."  Mr. Connors quotes the Religious Beliefs and Practices program statement (PS5360.09) again as the Warden and Regional Director did so prior.  Mr. Connors states, "our review revealed the institutions Chaplaincy Services staff has worked diligently to provide you [plaintiff] with the ability to adhere to your tenets of your faith and ensure that they are upheld and facilitated to the maximum extent possible."  Mr. Connors re-states prior responses and closed with, "We encourage you [plaintiff] to continue working with the institution's chaplains to address any additional religious needs you may have, which may include the need to utilize the New or Unfamiliar Religious Components Questionnaire Form for requests that are new or unfamiliar to your institution."

### Altar/New or Unfamiliar Religious Components Questionnaire Form / Administrative Remedies for Staff's Failure to Respond

169.  The constant arguing with BOP staff by plaintiff in trying to get accommodations for plaintiff's sincerely held beliefs and practices took a toll on plaintiff's mental and physical

health.  Such was negatively affecting the plaintiff's spiritual practices. The plaintiff chose to manage as best as he could, though in doing so, the plaintiff continued to be heavily burdened and restricted due to BOP refusing to accommodate plaintiff's sincerely held beliefs and practices.

170.  Plaintiff lived off of eating lacto-vegetarian items from the commissary and supplementing such with fresh fruit and uncooked vegetables available from inmate kitchen workers in the "underground" market to try to stave off malnutrition. While doing so, plaintiff attempted to follow his religious dietary restrictions as best as possible, despite commissary items being factory prepared and loaded with garlic and onion that are prohibited ingredients for plaintiff's faith.  However, such was a better situation versus the chow hall items.

171.  Plaintiff found employment for a while with certain staff willing to allow plaintiff to observe his faith's holy/fast days without BOP sanctions by working as a mental health companion/mentor until eventually that arrangement changed. The plaintiff then arranged with other staff to be employed doing special projects of painting murals and other fine art projects needed throughout the facility that allowed plaintiff to set his own schedule and therefore accommodates plaintiff's religious beliefs and practices, albeit at a cost of no steady official employment nor pay.

172.  During this period of time, staff involved in issues with plaintiff's religious accommodations transferred from the facility and a new group of administrative staff came into operation.  This created new policies that further affected plaintiff's central tenets of plaintiff's faith and others of plaintiff's faith group transferred to other BOP facilities.

173.  The new warden, Mrs. Licon-Vitale, created a policy that nothing could be on top of inmate's personal lockers anymore from 7:30 a.m. to 3:30 p.m.  No Bible, water bottle, nor

clock.  Due to this new policy, the plaintiff started getting harassed by mid- to administrative-level staff about plaintiff's small personal altar on top of his locker.  Plaintiff had this altar for several years without issue until now.

174.  In April 2019, plaintiff and Warden Licon-Vitale have a confrontation in plaintiff's living area due to plaintiff having an altar on top or his personal locker.  Mrs. Licon-Vitale demands that plaintiff put away the altar while plaintiff is attempting to explain why doing so would be a substantial burden and insulting to plaintiff's sincerely held religious beliefs and practices.  Mr. Licon-Vitale retorts loudly in front of other staff that, "I don't care what your [plaintiff] f**king religion is!  All religions are the f**king same!"  Then the plaintiff asks Mrs. Licon-Vitale calmly why she is yelling when plaintiff is not raising his voice and is just trying to discuss the matter and importance of the altar in plaintiff's beliefs and practices.  Mrs. Licon-Vitale orders the altar taken down and plaintiff complied since it was obvious Mrs. Licon-Vitale was unable to discuss the matter and plaintiff was therefore left with no other choice at the time.

175.  On April 29, 2019, after plaintiff spoke to Acting Supervisory Chaplain Connors about the altar situation, Mr. Connors found plaintiff sincere in the matter of an altar.  Mr. Connors issues plaintiff a permit to have a personal altar set up on plaintiff's personal locker and Mr. Connors asks plaintiff to also post a copy on front of plaintiff's personal locker just to be safe in notifying all staff that see the altar.

176.  On May 6, 2019, at 1:37 p.m. (after numerous prior confrontations with Unit Manager Moore over the altar issue despite the posted permit), Unit Manager Moore and Lt. Shortt confront plaintiff in plaintiff's living area about altar and demand the altar be disassembled immediately despite plaintiff pointing out the permit and plaintiff explaining the importance of the altar in plaintiff's beliefs and practices of plaintiff's faith.  Plaintiff was threatened by Lt.

Shortt.  Mr. Shortt tells plaintiff that plaintiff is disobeying a direct order and inciting a riot and told plaintiff to turn around.  When plaintiff asks why, Mr. Shortt states that the plaintiff will be taken to the Special Housing Unit (Shu).  Plaintiff refused to turn around as Lt. Shortt pulls out a set of handcuffs.  Plaintiff tells Mrs. Moore and Mr. Shortt that they are ordering plaintiff to do something that is deeply against the plaintiff's beliefs and that Mrs. Moore and Mr. Shortt are substantially burdening the plaintiff's beliefs and practices. Plaintiff tells Mrs. Moore and Mr. Shortt that they are in fact violating plaintiff's religious rights.  Mr. Shortt tells plaintiff that Mr. Shortt doesn't care, and plaintiff is going to the SHU if the plaintiff does not immediately comply with the order.

177.  The plaintiff has never been in trouble in the BOP and was forced to make a painful decision.  Plaintiff complied and was further told by Mr. Shortt that if plaintiff were found not in compliance with the order and the facility's current policy, the plaintiff would be immediately taken to the SHU, incident report filed, and sanctioned.  This for an altar that consisted of a few photographs, a saffron colored cloth and all in an area of less than two feet by two feet on top of inmate's personal locker.

178.  At 2:30 p.m. (on the next available inmate move for the compound), plaintiff goes to the chapel to speak with Acting Supervisory Chaplain Connors about what just occurred with Unit Manager Moore and Lt. Shortt.  Plaintiff asks Mr. Connors what can be done to possibly rectify this latest infringement upon the plaintiff's sincerely held beliefs and practices.  Mr. Connors tells the plaintiff that the permit should have stopped the harassment and stated that the actions and orders by the staff violates the plaintiff's religious rights.  Mr. Connors laments, though, that the staff will not listen to Chaplaincy Services on this matter.

179. At 3:30 p.m., the plaintiff returns from the chapel to the living unit and meets with

Counselor Gerhard, who also witnessed the confrontation with Unit Manager Moore and Lt.

Shortt due to Counselor Gerhard's office location only a few yards away and directly opposite of

plaintiff's living area.  Plaintiff requests an Informal Resolution Form through Counselor

Gerhard to file on the altar situation.

180. On May 10, 2019, plaintiff files the informal resolution with Counselor Gerhard.

181. On May 17, 2019, the plaintiff receives a response to the Informal Resolution.  Assistant

Warden Comstock responded on May 15, 2019, stating, "you [plaintiff] must request an

accommodation utilizing the "New and Unfamiliar Religious Components Questionnaire [sic],

Form BP-A0822." Mrs. Comstock states, "In addition, you [plaintiff or counselor?] must follow

current policy and rules until a decision to approve or deny his [plaintiff's] accommodation

request is made."

182. On May 24, 2019, plaintiff files a New or Unfamiliar Religious Components

Questionnaire (BP-0A0822), as requested by AW Comstock, through interfacility mail to AW

Comstock, as at this time Acting Supervisory Chaplain Connors was on a two month sabbatical

and AW Comstock stated within the Informal Resolution to file the BP-A0822 with either the

Chaplain or AW Comstock.  The plaintiff included with the BP-A0822 a typed cover letter

detailing the plaintiff's requests and requesting that any and all response to be in writing and

such be made available to plaintiff within the 120 days stipulated by the BOP for the deadline for

a response by staff to a BP-A0822.

183. Acting Supervisory Chaplain Connors also received a copy of the BP-A0822 when Mr.

Connors returned from his sabbatical but stated to the plaintiff that AW Comstock and the

administration created the problem and won't listen to Chaplaincy Services, so Mr. Connors is going to let Mrs. Comstock deal with the situation.

184. On September 29, 2019, plaintiff filed an Informal Resolution with Counselor Gerhard due to, "the facility's administration's failure to acknowledge and address the New or Unfamiliar Religious Components Questionnaire (BP-A0822)", after plaintiff waited for more than the response deadline of 120 days for staff to respond to the BP-A0822. Plaintiff requests a response to the BP-A0822, and plaintiff attached copies of the altar permit, prior informal resolution on the altar matter, response by AW Comstock to that Informal Resolution, and a copy of the BP-A0822.

185. On October 15, 2019, after no response to the Informal Resolution after 16 days (FCI Danbury Institutional Supplement states a response deadline for staff to respond is set at a five-day maximum for Informal Resolution), and since BOP program statement PS548.12 states that the Administrative Remedy (BP-9) must be submitted to staff within 20 days of the incident being filed upon, plaintiff files a Request for Administrative Remedy (BP-9) with all preceding documentation attached. Plaintiff states lack of response by administration and alleges ongoing violations of plaintiff's religious rights by said administration under Religious Freedom Restoration Act, First Amendment, and Equal Protection Clause of Fifth Amendment.

186. Counselor Gerhard tells plaintiff that Mrs. Gerhard personally hand delivered the BP-9 packet to AW Comstock. At this time AW Comstock was tasked with some of the warden duties as Warden Licon-Vitale was busy handling some of the fallout over the death of Jeffrey Epstein at MDC Brooklyn, and as so, Mrs. Licon-Vitale was away from FCI Danbury for much of this period.

187. On October 17, 2019, two days after plaintiff filed the BP-9, plaintiff receives a reply to the Informal Resolution. AW Comstock responds stating, "Per AW Comstock, submit a request on appropriate form to be reviewed." According to Counselor Gerhard, who spoke to Mrs. Comstock on behalf of plaintiff, Mrs. Comstock refuses plaintiff's offer to speak in person with the plaintiff and instructs that plaintiff is to file a BP-A0822 again. Plaintiff had already done so, as well as included all such material with the BP-9 filed with Mrs. Comstock two days prior. Mrs. Gerhard agreed with plaintiff that at this point it was frivolous to comply with Mrs. Comstock's request to file another BP-A0822 since Mrs. Comstock already has received multiple copies of said BP-A0822 over the past many months and all without a response from Mrs. Comstock, as well as another copy of said BP-A0822 attached to the BP-9 also given to Mrs. Comstock personally by Mrs. Gerhard just two days prior. Mrs. Gerhard counselled plaintiff to send no more BP-A0822's until Mrs. Comstock responds to the prior BP-A0822's and/or the BP-9 with attached copy of the BP-A0822.

188. On November 25, 2019, after 41 days without response to the BP-9 (BOP Program Statement PS542.18 allows a maximum of 20 days for staff at the institutional level to respond and, if necessary, a one-time extension of an additional 20 days), plaintiff files through the prison facilities mailroom a Regional Administrative Remedy Appeal (BP-10) to Regional Headquarters in Pennsylvania. Plaintiff states in the BP10 the situation and lack of response to the BP-A0822 and BP-9. Plaintiff included all preceding documentation as attachments to the BP10.

189. On December 12, 2019, plaintiff receives the BP10 in the mail as rejected. Reason for rejection given states, "must first file a BP-9 request through the institution for the warden's review and response before filing an appeal at this level".

190.  Plaintiff resends the BP-10 package along with a cover letter begging the Regional Administrative Remedy Administrator to reconsider the matter and consider that the administrators at all levels are aware of the current situation and to check with them if need be for guidance.

191.  On December 30, 2019, plaintiff receives in the mail the rejected BP-10.  The Northeast Regional Administrative Appeals Administrator states, "refer to previous notice."

192.  On January 9, 2020, plaintiff files a Central Office Administrative Remedy Appeal (BP-11), through the prison facilities mailroom to Washington, D.C. Plaintiff states the situation and hoping that at this highest level and being the final administrative remedy process step, that the BOP staff would, if not fix the situation, at the very least address the lack of response to the BP-A0822.  As done for all preceding levels, plaintiff includes all preceding paperwork, including a copy of the BP-A0822.

193.  On February 14, 2020, plaintiff received in the mail the response to the BP-11 as rejected by the National Inmate Appeals Administrator, defendant Ian Connors.  Mr. Connors states, "concur with notice of Regional Office and/or Institution for Rejection.  Follow directions provided as prior rejection notices."

194.  Per BOP program statement PS542.18 states, "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level."  Since plaintiff never received a response, timely or otherwise, to the BP-9, the plaintiff following BOP's program statements, considered the lack of response as a denial and therefore filed the BP-10 and then the BP-11 as required to exhaust inmate remedies.  Yet the Northeast Regional Administrative Remedy Administrator, defendant John Doe, and the National Inmate Appeals Administrator, defendant Ian Connors, failed to

follow BOP's program statements or attempt to resolve a legitimate set of issues clearly raised and documented by plaintiff. According to policy statement for the Administrative Remedy Process, the reason the Administrative Remedy Program was created was to resolve such legitimate issues. Therefore, the plaintiff exhausted all remedies at all levels to resolve the numerous issues regarding the BOP's staff continued failure to accommodate plaintiff's sincerely held religious beliefs and practices that plaintiff has shown through documentation is neither new or unfamiliar to plaintiff's faith group. Plaintiff's faith group, which is the largest theistic tradition of the erroneously grouped "Hindu religion", is the third largest faith group in the world and therefore should not be new or unfamiliar to the BOP and its staff.

### COVID-19 Lockdown/Scabies Situation
### Certified Religious Diet Accommodations

195.  On March 15, 2020, FCI Danbury goes on lockdown due to COVID-19 and all meals are served in the units. Eventually as time went on and restrictions slightly eased, all inmates began picking up their regular mainline perishable meals, now in Styrofoam trays, at the Food Service Chow Hall and bringing them back to the inmates living units.

196.  At the beginning of the year, a new warden was assigned to FCI Danbury, and some administrative staff left the facility. Acting Supervisory Chaplain Connors left and a new Supervisory Chaplain, Iwuji, and two new Staff Chaplains replaced Mr. Connors.

197.  On October 23, 2020, at 2:09 p.m., plaintiff sent an Electronic Request to Staff addressed to Chaplaincy Services stating due to the scabies situation, plaintiff will have no access to any personal property for a week, including commissary food plaintiff was eating in place of the Food Services mainline food, which does not meet plaintiff's sincerely held religious dietary restrictions. Plaintiff states the situation, religious dietary restrictions, and the need to

find a solution to the matter as soon as possible or plaintiff will be forced to fast for those days of the quarantine.

198. On October 24, 2020, at 4:12 p.m., plaintiff sent an Electronic Request to Staff addressed to Chaplaincy Services stating no contact with anyone from Chaplaincy Services. Plaintiff states plaintiff spoke to Health Services Administrator, Mrs. Dukate and Dr. Greene as well as the Unit Manager, Mr. Lewis, on the matter, but plaintiff was told only Chaplaincy Services could address the matter. Plaintiff states what Food Services food items would work to meet plaintiff's religious dietary restrictions as a temporary solution until plaintiff is able to get his commissary food items out of quarantine. Plaintiff states at the moment he is only getting milk and fresh fruit other inmates are giving him from their allotment to help plaintiff. Plaintiff closes by asking someone from Chaplaincy Services come speak to plaintiff on the matter.

199. On October 25, 2020, at 4:30 p.m., plaintiff sent an Electronic Request to Staff to Chaplaincy Services stating, "Third day still without contact from any of you, Why?"

200. On October 26, 2020, Staff Chaplain Cohen came to plaintiff's living unit to speak with plaintiff on the food issue during the scabies quarantine. Mr. Cohen tried to resolve the issue by allowing plaintiff to order items from commissary for that week. However, administrative staff would not approve such action.

201. On October 27, 2020, Staff Chaplain Cohen came to plaintiff's living unit again to speak with plaintiff at length and conducted a Certified Religious Diet Questionnaire Form and interview. Plaintiff still only able to eat some fresh fruit and milk provided by other quarantined inmates in his unit from their meal allotment.

202. On October 28, 2020, Staff Chaplain Cohen came to plaintiff's living unit again to inform plaintiff that Mr. Cohen found plaintiff sincere in plaintiff's religious beliefs regarding

plaintiff's faith's religious dietary restrictions.  Mr. Cohen told plaintiff that Mr. Cohen spoke

with Food Services and told Food Service to provide plaintiff with a Certified Religious Diet, but

as no-flesh with plaintiff's understanding that plaintiff will not make an issue of other prohibited

ingredients such as garlic and onion as long as the meals do not contain animal or egg products.

Mr. Cohen tells plaintiff to pick up meal starting with dinner that night.

203.  At 10:02 p.m., plaintiff sent an Electronic Request to Staff addressed to Rabbi Cohen

(Staff Chaplain Cohen) summarizing the events of the past three days, the solution, and that

plaintiff received the dinner meal without issue.  Plaintiff thanks Mr. Cohen for Mr. Cohen's

efforts in the matter.

204.  On October 31, 2020, at 9:25 a.m., plaintiff sent an Electronic Request to Staff to

Chaplaincy Services asking for ingredient lists for the two Meal Mart hot trays the CRD no-flesh

diet allows so plaintiff can verify neither tray contains egg products.

205.  On November 5, 2020, at 7:58 a.m., plaintiff sent an Electronic Request to Staff

addressed to Chaplaincy Services stating the ongoing issue of Food Services inmate workers

trying to give plaintiff the Pareve Vegetarian Lasagna since Mr. Cohen confirmed that meal does

indeed contain eggs products against plaintiff's religious beliefs.  Plaintiff states plaintiff's

refusal to accept the tray and that Supervisory Chaplain Iwuji came to plaintiff's living area and

notified plaintiff that only the Vegetarian Pasta Meal Mart meal will be provided to plaintiff

from now on.  Plaintiff states hopefully this night is the last of the issue and that plaintiff was

writing to let Chaplaincy Services know the situation.

206.  On December 2, 2020, at 6:44 p.m., plaintiff sent an Electronic Request to Staff

addressed to Chaplaincy Services stating plaintiff spoke to Staff Chaplain Cohen the previous

night, but the situation with Food Services had changed due to COVID-19 issues and therefore

also a change of Food Service inmate workers.  Plaintiff could not get the Vegetarian Pasta Meal

Mart meal because allegedly the new inmate workers were not aware of such accommodations

and furthermore the inmate workers alleged Food Services was running out of Vegetarian Pasta

Meal Mart meals.  The issue repeated itself again for dinner and Food Services staff were

unhelpful.  Plaintiff asks Chaplaincy Services to please talk with Food Services on the matter,

"and hopefully find a solution to the problem."

207.  On December 3, 2020, at 3:17 p.m., Staff Chaplain Cohen responds to plaintiff's

Electronic Request to Staff from December 2, 2020.  Mr. Cohen states, "I reached out to Food

Services on your [plaintiff] behalf before lunch today.  Let us know if you're still having any

problems."

208.  On December 3, 2020, at 3:32 p.m., plaintiff sent an Electronic Request to Staff

addressed to Chaplaincy Services stating, "The lunch meal was correct and hopefully it is

resolved.  Thank you for your efforts in the matter."

209.  On January 16, 2021, at 12:46 p.m., plaintiff sent an Electronic Request to Staff

addressed to Chaplaincy Services stating that, "Due to the nationwide BOP lockdown instituted

as of this morning, the inmate workers are not working in food services and as such the staff are

assembling the meals and delivering them to the units.  The issue is that my specific meals

apparently are not being prepared by the staff workers and only regular common fare meals are

being delivered to our unit, despite my religious beliefs.  My religious diet accommodations

differ from the other common fare inmates, as the food staff have been made aware of, were

being accommodated per religious services prior to the latest lockdown.  Can you please look

into this matter and hopefully rectify the issue as it was before this latest lockdown?"

210. At 1:27 p.m., Staff Chaplain Bell responds to plaintiff's earlier Electronic Request to Staff. Mr. Bell states, "another Chaplain assisted you with this before, so I don't have the background to this story. Please explain to me the type of meal you were approved for so I can speak to Food Services on your behalf."

211. At 1:55 p.m., plaintiff responds to Staff Chaplain Bell's Electronic Request to Staff response. Plaintiff states the accommodations created by Staff Chaplain Cohen and what was provided for cold and hot meals for lunch and dinner, with breakfast not being an issue on CRD as those did not contain meat nor eggs. Plaintiff states that hopefully that helps to clarify and answers Mr. Bell's questions and if not, to please feel free to ask any questions in person or through this electronic means."

212. On January 17, 2021, at 8:37 a.m., Staff Chaplain Bell responds to plaintiff's Electronic Request to Staff response. Mr. Bell responds, "Great job! Well written explanation of your needs. I will discuss this with Food Services shortly with the hope this will be resolved before lunch. Keep me posted on any further issues."

213. At 9:08 a.m., plaintiff responds to Staff Chaplain Bell's Electronic Request to Staff response stating, "Thank you, Sir. I appreciate your efforts in this matter and will keep you posted."

214. At 8:38 p.m., plaintiff sent an Electronic Request to Staff addressed to Staff Chaplain Bell stating, "Thank you for your quick response and efforts in this matter. Both the lunch and dinner meals tonight were correct and so hopefully the issue is rectified for time being. Thank you."

**Personal Religious Items/**
**Religious Special Purchase Order**

215.  On January 20, 2021, at 7:58 a.m., plaintiff sent an Electronic Request to Staff addressed to Religious Services requesting a Special Purchase Order Form to attempt to order two personal religious items.

216.  At 8:47 a.m., Supervisory Chaplain Iwuji replies stating, "a staff chaplain will stop by soon with an SPO Form."

217.  On February 6, 2021, at 5:15 p.m., plaintiff sent an Electronic Request to Staff addressed to Supervisory Chaplain Iwuji thanking him for approving the Tulasi neck beads (kunti mala), but also stating plaintiff is confused why the tilak clay was not approved.  Plaintiff states the use of tilak clay and that such tilak is a central tenet of plaintiff's faith.  Plaintiff further states that plaintiff has plenty of scriptural references to support such claims and asks that Mr. Iwuji speak with plaintiff's faith's subject matter expert on the matter and let plaintiff know the outcome.

218.  On February 22, 2021, at 11:55 a.m., plaintiff sent an Electronic Request to Staff addressed to Supervisory Chaplain Iwuji asking status on the matter of the tilak since no response was given to plaintiff's request on February 6, 2021.

219.  At 4:57 p.m., Supervisory Chaplain Iwuji replies stating, "If there is a requirement for tilak, we can have it as a congregate religious item.  It would be put on in the chapel only."

220.  On February 24, 2021, at 11:29 a.m., plaintiff sent an Electronic Request to Staff addressed to Supervisory Chaplain Iwuji asking if the tilak is made a congregate item and put on in the chapel only, can a devotee of plaintiff's faith then wear such tilak around the facility, as per plaintiff's faith group's scriptures.  Plaintiff explains that tilak is applied at least twice daily. Plaintiff asks is something could be worked out to accommodate such practice if plaintiff is only

allowed to put the tilak on in the chapel.  Plaintiff then asks, "why only the chapel?", and further asks Mr. Iwuji to please clarify whether tilak can only be approved as a congregate item and not a personal item.  Plaintiff asks if such limitation is due to the tilak clay being perhaps a safety and/or security issue.  Plaintiff then states that he doubts the clay, "could only be work in the chapel due to the markings since other faith groups are allowed to mark their body similarly in here."  Plaintiff offices other materials that, per plaintiff's faith, are acceptable to use for tilak if the Gopi-candana clay is the issue.  Plaintiff asks Mr. Iwuji to, "please be more specific on the issue involved in approving this request so perhaps we can find a solution that works."  Plaintiff furthermore asks Mr. Iwuji if Mr. Iwuji contacted plaintiff's faith's subject matter expert on the matter and gives thanks to Mr. Iwuji for responding and trying to work with the plaintiff on the matter.

221.  At 12:27 p.m., Supervisory Chaplain Iwuji replies stating, "To use the Tilak outside the chapel area, we need to go through the New and Unfamiliar Religious Components Questionnaire process.  According to you [plaintiff], some other faith groups are being accommodated in that regard here. Letting me know the faith groups concerned and the accommodations grated might help".

222.  At 5:49 p.m., plaintiff replies to Supervisory Chaplin Iwuji's response.  Plaintiff states that plaintiff does, "not mind utilizing the New and Unfamiliar Religious Components Questionnaire" and explains that plaintiff has a completed New and Unfamiliar Religious Components Questionnaire (BB-A0822) on this issue as well as, "other issues of accommodations", and plaintiff states he has gone through this process many times in the past. Plaintiff explains the history of filing the most recent BP-A0822 and BOP staff at all levels failure to address the issue.  Plaintiff states that, "if we must go this route again, I [plaintiff] do

have a filled out one (BP-A0822) available."  Plaintiff then asks why an item that is a central

tenet of plaintiff's faith needs to go through this up to 120-day process to approve and that if this

is the case, then plaintiff will be addressing other accommodation issues as well.  Plaintiff then

states he wonders why Mr. Iwuji still is not stating what the specific issue is with not allowing

plaintiff to order and use the tilak clay nor whether Mr. Iwuji has spoken to plaintiff's faith's

subject matter expert on the issue.  Plaintiff states he is certain anyone of plaintiff's faith would

confirm plaintiff's statements on the matter.  Plaintiff further states he is not trying to be

disrespectful, but states, "these are central tenet items of my faith that I am speaking of and my

[plaintiff] faith group is the third largest faith group in the world, so this is not an obscure

practice of my [plaintiff's] faith group nor is it an obscure faith group". Hence plaintiff's

confusion for Mr. Iwuji's request for a BP-A0822 to be filed to accommodate the tilak as a

personal religious item and not requiring a BP-A0822 to accommodate the tilak as a

congregational item. Plaintiff also replies to Mr. Iwuji's question of what other faith groups are

accommodated.  Plaintiff states ashes placed upon foreheads of the staff and inmates of here

(FCI Danbury) on Palm Sunday by Supervisory Chaplain Iwuji.  Plaintiff also reminds Mr. Iwuji

that Mr. Iwuji still has not stated the specific reason(s) for not approving plaintiff's ordering and

possessing the tilak clay.

223.  At 8:24 p.m., due to an issue with the computer system for the Electronic Request to

Staff, plaintiff was unable to complete the rest of the message sent at 5:49 p.m.  So, plaintiff

completes the rest of the message asking Supervisory Chaplain Iwuji to please let plaintiff,

"know more so perhaps we can work to find a solution on the matter".

224. On March 2, 2021, at 3:22 p.m., Supervisory Chaplain Iwuji replies stating, "If you have submitted a questionnaire on the matter before, there is no need completing a new questionnaire. I would like to have a copy of the old questionnaire and the response you received".

225. On March 3, 2021, at 9:58 a.m., plaintiff responds to Supervisory Chaplain Iwuji's reply. Plaintiff explains in detail that situation and history of plaintiff filing the last BP-A0822 starting on May 24, 2019, and again repeated to Mr. Iwuji that plaintiff never got a response and plaintiff's exhaustion of remedies on the matter. Plaintiff further states that in plaintiff's experience, such a lack of response to plaintiff filing such BP-A0822 is not unusual, but the norm since such has happened to plaintiff spanning many years. Plaintiff explains that plaintiff's current request for the two religious items (kunti mala and tilak clay) is because plaintiff was, "encouraged by Staff Chaplain Cohen to put in a request for such religious items", as plaintiff claims he has, "heard from you [Mr. Iwuji] in the past as well Staff Chaplain that my [plaintiff's] faith group is easy to accommodate and such simple requests would not be an issue". Plaintiff repeats from plaintiff's earlier messages that Mr. Iwuji still has not explained, "the exact issue(s) with why this item cannot be accommodated without the BP-A0822 process or as congregate only with use restricted to the chapel". Plaintiff also states Mr. Iwuji has not clarified whether Mr. Iwuji spoke to plaintiff's subject matter expert on the matter. Plaintiff states confusion as to the issue of the matter and asks Mr. Iwuji to please explain the issue(s) with accommodating the tilak so that the plaintiff, "can understand what the problem is and if it is an easy matter to fix or it cannot be handled at the institutional level".

226. At 12:42 p.m., Supervisory Chaplain Iwuji replies, "If you [plaintiff] are requesting for the use of tilak as a once-a-year ceremony like Christian ashes, you [plaintiff] can direct your [plaintiff's] request in that regard, and we will look into it". Mr. Iwuji further states, "The

department is willing to accommodate your [plaintiff's] request as a ceremonial religious property just fez, hlath, etc. In that case, it would be used in the chapel only."

227. At 1:28 p.m., plaintiff replies stating, "As I [plaintiff] stated earlier in this Electronic Request to Staff message chain, tilak is used daily, not once yearly and why does it matter if it is used once a year or daily? It is still used and displayed on the body, and it is still an item similar to, but not same as, the ashes for Christians or the yarmulke for Jewish that are noticeable items and publicly displayed openly whereas this is not exactly the case with tilak". Plaintiff requests Mr. Iwuji to contact plaintiff's faith's subject matter expert and/or outside faith community on the issue if Mr. Iwuji does not know and/or trust what plaintiff is stating on the matter. Plaintiff also again states he [plaintiff] is, "still confused what the problem is in approving a piece of mud or sandalwood paste to be used to mark twelve parts of the body and only one of those markings being visible in any way on the forehead as the Christian ashes". Plaintiff again requests Mr. Iwuji to clarify what the issue(s) are with approving such an item.

228. On March 4, 2021, at 1:00 p.m., Supervisory Chaplain goes to plaintiff's living unit to speak to plaintiff, but plaintiff is on the inmate telephone with his family, so Mr. Iwuji leaves.

229. At 1:25 p.m., plaintiff sends an Electronic Request to Staff addressed to Supervisory Chaplain Iwuji apologizing to Mr. Iwuji for missing Mr. Iwuji due to being on the telephone. Plaintiff offers options to meet with Mr. Iwuji at another time. Plaintiff states that if the effort to meet is about the tilak, the plaintiff, "did not mean for it to be such an issue as I [plaintiff] was under the impression by Chaplaincy staff that it would be a simple matter and not the back-and-forth situation it has become". Plaintiff then summarizes plaintiff's prior messages on the matter and once again apologizes for it to be such a problem.

230.  On March 22, 2021, at 1:31 p.m., plaintiff sent an Electronic Request to Staff addressed to Chaplains stating, "A month ago I [plaintiff] filed a Religious SPO Form with Chaplain Bell in regard to ordering a set of neck breads (Kunti mala) and I [plaintiff] am inquiring as to the current status on this order as no money has been encumbered from my [plaintiff's] inmate account as of yet.".

231.  At 2:27 p.m., Supervisory Chaplain Iwuji replies that, "once a SPO has been approved and sent to Trust Fund, the rest is left to Trust Fund.  You [plaintiff] need to get with Trust Fund".

232.  At 5:55 p.m., plaintiff sent an Electronic Request to Staff addressed to the Acting Supervisor of Trust Fund, Mr. Lewis.  Plaintiff explains the situation with the religious items special purchase order that was filed with Chaplain Bell and that no money was encumbered and that Chaplain staff told plaintiff to contact Trust Fund on the matter.  Plaintiff asks if Mr. Lewis could, "look into the status of this order", and let plaintiff know what the situation might be.

233.  On March 23, 2021, at 3:42 p.m., Acting Supervisor of Trust Fund, Mr. Lewis, states, "I have forwarded your inquiry to Mr. Knight and Mr. Johnson".

234.  At 6:42 p.m., plaintiff replies thanking Acting Supervisor of Trust Fund for forwarding the inquiry to Mr. Knight and Mr. Johnson.

235.  On April 11, 2021, at 7:18 p.m., plaintiff sent an Electronic Request to Staff addressed to Acting Supervisor of Trust Fund, Mr. Lewis, stating there has been no contact from Mr. Knight and Mr. Johnson, nor an encumbrance of funds.  Plaintiff states he, "is just wondering what the status of the matter is at this point".

236.  On April 26, 2021, at 1:02 p.m., plaintiff sent an Electronic Request to Staff addressed to Trust Fund Ruiz/Staff (Mr. Ruiz being the Trust Fund Supervisor) stating plaintiff has still not

heard from anybody about the religious SPO matter and asks if somebody could, "please look into this and respond to me [plaintiff] on the status of this matter".

237.  On June 3, 2021, at 4:18 p.m., plaintiff sent an Electronic Request to Staff addressed to Unit Manager Lewis and Counselor Bozek stating plaintiff has had no status update on plaintiff's religious SPO and after speaking with Mr. Bozek on June 2, 2021, Mr. Bozek suggested that plaintiff first send an Electronic Request to Staff to Unit Manager Lewis and Mr. Bozek in hopes of looking into the status of the religious SPO before plaintiff files an Informal Resolution.

238.  On June 12, 2021, at 7:45 a.m., plaintiff sent an Electronic Request to Staff to Unit Manager Lewis and Counselor Bozek stating plaintiff has had no response from either Mr. Lewis nor Mr. Bozek and plaintiff requests Informal Resolution form.

239.  On June 28, 2021, plaintiff sends a paper Inmate Request to Staff to Counselor Bozek requesting an Informal Resolution form.

240.  On July 6, 2021, plaintiff receives in inmate mail plaintiff's paper Inmate Request to Staff from June 28, 2021, with an attached Informal Resolution form that plaintiff then fills out requesting to know the status of plaintiff's religious SPO from Trust Fund/Commissary. Plaintiff sends to Counselor Bozek through inmate mail said Informal Resolution with attachments of Electronic Request to Staff correspondence on the matter dating from March 2021 to June 2021.

241.  On July 19, 2021, plaintiff speaks very briefly with Counselor Bozek in plaintiff's living unit about lack of response to the Informal Resolution and plaintiff attempts to hand Mr. Bozek a paper Inmate Request to Staff requesting a BP-9 to address the matter.  However, Mr. Bozek refused to accept the paper Inmate Request to Staff at that time stating the reason being Mr. Bozek just got a response to the Informal Resolution the day before by Trust Fund Supervisor Ruiz and that plaintiff will get said response shortly.

242. On July 24, 2021, plaintiff sends through inmate mail a paper Inmate Request to Staff to Counselor Bozek stating still no response, the response deadlines per PS542.10 and requesting therefore a BP-9 form from Mr. Bozek.  Plaintiff attached a copy of the unanswered Informal Resolution as well as the Electronic Request to Staff material going back to March 2021.

243. On August 3, 2021, at 12:47 p.m., plaintiff sent an Electronic Request to Staff to Case Manager Coordinator Cocho stating the lack of response still and efforst made by plaintiff to resolve the matter.  Plaintiff asks Mr. Cocho if Mr. Cocho could, "look into the status of the situation and let me [plaintiff] know, or delegate someone to address this matter with me [plaintiff]."

244. At 1:17 p.m., Case Manager Coordinator Cocho replies to plaintiff's Electronic Request to Staff stating. "Forwarded to West Unit Team for response."

245. At approximately 1:20 p.m., Case Manager Lawn comes and speaks with the plaintiff in plaintiff's living unit about the matter.  Mr. Lawn stated Counselor Bozek was not a work and Mr. Lawn would speak with him on the matter when Mr. Bozek got back.

246. On August 4, 2021, at 2:12 p.m., Counselor Canarozzi also replies to plaintiff's Electronic Request to Staff stating, "Sir, unfortunately Mr. Bozek [sic] has not been at work for almost two weeks.  Your request may be in his computer, but I have not seen it on his desk. Kindly, forward me the BP-8 [Informal Resolution] you are refering and I will get you back on the right track."

247. At approximately 2:30 p.m., Case Manager Lawn came to plaintiff's living unit to let plaintiff know that Mr. Lawn spoke to Counselor Bozek on the matter and that Mr. Bozek is writing the response to plaintiff's Informal Resolution and that plaintiff should get said response this day or the next day at latest.

248.  At 3:47 p.m., plaintiff sends an Electronic Request to Staff to Case Manager Coordinator Cocho thanking Mr. Cocho and Mr. Canarozzi for their responses and help as well as stating that Case Manager Lawn got involved and stated what Mr. Lawn told the plaintiff stating, "Case Manager Lawn came by again today to see me [plaintiff] and stated that Mr. Bozek was now writing up the response for the Informal Resolution today and that I [plaintiff] should be getting it by tomorrow."

249.  On August 6, 2021, at approximately 12:10 p.m., Case Manager Lawn sees plaintiff at the chow hall during lunch meal and asks plaintiff if Counselor Bozek gave plaintiff the response to the Informal Resolution yet.  Plaintiff answers n the negative.

250.  At approximately 3:30 p.m., plaintiff receives in the inmate mail the Informal Resolution, plaintiff's Electronic Request to Staff attachments, and Trust Fund Supervisor Ruiz's response.  Mr. Ruiz stated, "You will be credited for SPO and you [plaintiff] can put a new one in."

### A Change in Bringing Lunch
### Meals From Food Service to Living Unit

251.  On March 25, 2021, at 11:40 a.m., plaintiff was told by Food Service Staff that plaintiff could not bring out plaintiff's lunch Certified Religious Diet (CRD) meal from the chow hall to take back to the living unit to offer before plaintiff's altar as per plaintiff's sincerely held religious beliefs and practices.  Plaintiff gave back the CRD meal and left the chow hall.  On the way out, Officer Null joked with plaintiff that was fast and when plaintiff told Mr. Null what happened, Lt. Gillespie overheard and got involved in the matter.  Mrs. Gillespie was aware of the situation due to another inmate speaking to her the day before about not being allowed to bring back their CRD meal at the lunch meal.  Mrs. Gillespie walked with plaintiff to speak with defendant Comstock.  Defendant Comstock stated that plaintiff must get with Chaplain Services

and that Supervisory Chaplain Iwuji would inform plaintiff of the proper procedures to seek such an accommodation since, per defendant Comstock, the facility does not currently offer such accommodations. Plaintiff left to go back to plaintiff's living unit, but sees Mr. Iwuji headed towards plaintiff so plaintiff stops and speaks with Mr. Iwuji on the matter.

252. After speaking on the matter, plaintiff and Supervisory Chaplain Iwuji came to a compromise that Mr. Iwuji would look into plaintiff bringing a small altar to the chow hall where staff could provide plaintiff an area suitable for plaintiff to offer food before eating it. Mr. Iwuji stated such a compromise is dependent upon being able to allow plaintiff enough time to do such rituals and eat without hindering the operations of the compound.

253. At 4:45 p.m., plaintiff sent an Electronic Request to Staff addressed to Supervisory Chaplain Iwuji summarizing what occurred around 11:40 a.m. to 11:45 a.m. Plaintiff further states that plaintiff saw Mr. Iwuji speak with an inmate of the Jewish faith group on the matter of bringing out CRD meals and then seeing Mr. Iwuji go speak with defendant Comstock. Plaintiff further states that Mr. Iwuji came by plaintiff's living unit later in the afternoon on a different matter with another inmate but did not speak with plaintiff at that time. Plaintiff asks Mr. Iwuji, "if there is any status update on the matter or when there might possibly be any further information forthcoming on this matter". Plaintiff thanks Mr. Iwuji for his efforts thus far and for speaking with plaintiff on the matter earlier at lunch time.

254. On March 27, 2021, per Chaplaincy Services, Jewish inmates are instructed in writing to take all meals, including their lunch CRD meals, from the chow hall and consume said meals in a specially prepared area in their living units starting today, March 27, 2021, for Passover ending on April 4, 2021.

255. On March 29, 2021, at 3:52 p.m., Supervisory Chaplain Iwuji replies to plaintiff's

Electronic Request to Staff Sent on March 25, 2021, at 4:56 p.m.  Mr. Iwuji states plaintiff has,

"been Hindu on Sentry since 2015 and you [plaintiff] have been in FCI Danbury since February

2016".  Mr. Iwuji further states, "I [Mr. Iwuji] suppose, taking meals to the units started last year

due to the COVID-19 pandemic.  Prior to the COVID-19 pandemic, were you [plaintiff] taking

your meals to the housing unit for religious reasons?  What changed?".

256. On March 30, 2021, at 11:45 a.m., plaintiff sent an Electronic Request to Staff

addressed to Supervisory Chaplain Iwuji in response to Mr. Iwuji's reply.  Plaintiff states, "As

we spoke on 3/25/2021, only recently during COVID-19 situation was I [plaintiff] provided a

modified menu common fare meals that at least met the lacto-vegetarian aspect of my

[plaintiff's] religious dietary restrictions thanks to Chaplain Cohen due to the Scabies situation

where I [plaintiff] was unable [sic] access my [plaintiff's] personal property for a week and

therefore also my [plaintiff's] commissary.  However, Chaplain Cohen stated that how he (Mr.

Cohen) accomplished this accommodation that I [plaintiff] could continue with such

accommodation after the Scabies situation was over as well if I [plaintiff] wanted to or I

[plaintiff] could go back to only eating from what I [plaintiff] bought at commissary, and he

(Staff Chaplain Cohen) would leave that decision up to me [plaintiff].  Before COVID-19, as I

[plaintiff] spoke with you (Mr. Iwuji) about on 3/25/2021, I [plaintiff] was solely buying items

off commissary and not going to Food Services for any meals.  This was how I [plaintiff] was

feeding myself in the past few years since the BOP refused to accommodate my [plaintiff's]

religious dietary restrictions.  None of this changes the fact that per my [plaintiff's] sincerely

held religious beliefs that I [plaintiff] still must offer through certain prayers and rituals the food

items (what my faith calls Bhoga) utilizing my [plaintiff's] altar in a clean place unadulterated by

such items (what my [plaintiff's] faith then considers prasādam and therefore sanctified).  Nor

does it change the fact that both breakfast and dinner meals for the entire inmate population are

brought back to the units, and even pre-COVID-19 that the entire general population was

allowed to bring back meals on the national holidays as well as other religious faiths being

accommodated to also do such on a regular basis as well.  Since speaking with you [Supervisory

Chaplain Iwuji] on 3/25/2021 and hearing nothing further on this matter, I [plaintiff] have just

gone back to eating commissary items for the lunch meal and not going to Food Service for

lunch meal and only pick up the breakfast and dinner meals that I [plaintiff] am (as well as the

whole inmate population) able to bring back to the living unit to properly sanctify before I

[plaintiff] eat such meals".

257.  On April 1, 2021, plaintiff begins again taking plaintiff's CRD lunch meals out of the

chow hall to bring back to plaintiff's living unit as the Jewish inmates are doing.

258.  Plaintiff, along with the other inmates of other faiths that receive CRD meals, continue

to bring back said CRD meals to the living units for all meals, even though Supervisory Chaplain

Iwuji never got back in contact with plaintiff on the matter.  However, an inmate of the Jewish

faith told plaintiff that the situation is fixed now.

## VI. Claims for Relief

259.  Defendants Bureau of Prisons, as a Federal agency, Michael Carvajal, as current

Director of BOP and as the Assistant Director of Correctional Program Division prior, and Kevin

Kelley as the Chief Chaplaincy Administrator, lack of action in their official capacity to review

the Bureau of Prisons policies and program statements in response to numerous complaints

spanning many years from inmates, BOP Chaplains, and outside faith community members

making these defendants aware of the failings of the BOP's policies and program statements to

adequately accommodate beyond the occidental faith groups, and specifically in the plaintiff's case, of those of "Hindu" faiths.  In doing so, the religious rights of the plaintiff are violated under Religious Freedom Restoration Act (RFRA), the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fifth and Fourteenth Amendments due to the substantial burden upon the plaintiff having to regularly argue to try to be accommodated any time certain staff change at a facility and also when the plaintiff gets transferred to another facility; whereas these issues are not the case for inmates of occidental faiths due to their religious beliefs and practices being already addressed and accommodated at the national BOP level through nationally implemented policies, program statements and staff training addressing these inmates faith needs and accommodations to be provided for them.

260.  Defendants Bureau of Prisons, as a Federal agency, Michael Carvajal as current Director of BOP and as the Assistant Director of Correctional Programs Division prior, and Kevin Kelley as Chief Chaplaincy Administrator, have in their official capacity, continued to simply classify followers of very distinct theistic traditions grouped by a geographic and not theistic reason, by Muslims since "Hindu" originates from Muslims calling people that lived around and east of the Sindhu/Sindu (Indus in English/Greek) River as "Hindu" since in Parsi "S" is pronounced as "H".  Later, in the 19th Century, the British Imperialists decided to simply and erroneously combine many of the theistic traditions of the area as one under the geographic moniker "Hindu" despite such terms not being found anywhere in the sastras (scriptures) of the theistic traditions now being addressed under that moniker.  This classification is very problematic as such grouping of such distinct theistic traditions that are, at best, only superficially similar would be as if placing Wicca, Asatru, Catholic, Protestant and other faiths found in the geographic area of Europe under one umbrella term such as "European" faith.  Then define such grouping by one of

the minority "sects" and claim that due to too many variations no central orthodoxy nor organization of such a grouping makes it impossible to accommodate such a group at a national BOP level while also any decision that is made regarding such a classified faith group is made with such erroneous reference. This is what the above- named Defendants have done and continue doing with plaintiff's faith group. In doing so, the above-named defendants have violated the plaintiff's religious rights under the Free Exercise Clause of the First Amendment by refusing to accommodate central tenants of the plaintiff's faith and under the Equal Protection Clause of the Fifth and Fourteenth Amendments by accommodating at the National BOP level the diversity of the occidental faiths as well as the "pagan" faiths of Asatru and Wicca theistic traditions as separate faith groups, but not that of the plaintiff's theistic traditions. Due to this failure by above-named defendants, a substantial burden is placed on the plaintiff's ability to practice his sincerely held beliefs and rituals. Therefore, the above-named defendants violated plaintiff's religious rights also under the Religious Freedom Restoration Act.

261. Defendant Michael Carvajal as the Regional Director in 2017 and defendant Ian Connors as the National Inmate Appeals Administrator failed in their official capacities to follow program statement 548.18 Observance of Religious Holy Days and Technical Reference Manual T5360.02 Religious Holy Days when deciding to deny plaintiff's Regional Administrative Remedy Appeal (BP10) and Central office Administrative Appeal (BP-11) for Holy Day accommodations by not consulting plaintiff's faith group outside in the community and furthermore per PS548.18, "The Bureau does not have the religious authority to determine whether inmates should be free from work/school for religious reasons on particular days" and per T5360.02, "Days of work proscription are established by each faith group for their community of believers". Defendant Carvajal and defendant Connors in deciding, "that the

warden adequately addressed the issues", despite evidence provided by the plaintiff to the contrary, and both defendants failure to follow BOP's program statements violated the plaintiff's religious rights under Religious Freedom Restoration Act, the Free Exercise Clause of the First Amendment, as well as the Equal Protection Clause of the Fifth and Fourteenth Amendments by placing a substantial burden upon the plaintiff in forcing the plaintiff to choose between his faith's practices and such matters as participating in program and employment with serious negative consequences if plaintiff chooses to follow his religious beliefs and practices all while the Bureau of Prisons accommodates other faith group's Holy and Fast Days similarly or beyond that requested by plaintiff and plaintiff has shown are not unique to the plaintiff's beliefs and practices but instead are the core Holy and Fast Days per plaintiff's faith group's beliefs and practices followed by millions of people.

262.   Defendant Ian Connors, as the National Inmate Appeals Administrator failed in his official capacity, to follow the BOP's program statement PS542.18 in denying the Central Office Administrative Remedy Appeal filed by plaintiff regarding the BP-A0822 plaintiff filed on May 24, 2019, and the BP-9 plaintiff filed on October 15, 2019, in which plaintiff never received a response to either.   Defendant Connor's response instructing plaintiff to follow prior rejection notices instructing that the plaintiff must wait for a response from the warden, despite the deadline for such a response per PS542.18 being long past and per PS54218, inmates are to handle such a lack of response by staff after deadline has past as a denial by staff at that level.   In denying the Central Office Administrative Remedy Appeal (BP-11), defendant Connors denied the plaintiff resolution to the BOP's failure to accommodate plaintiffs sincerely held religious beliefs and practices.   Therefore, defendant Ian Connors is responsible for violating plaintiff's

religious rights under the Free Exercise Clause of the First Amendment, Equal Protection clause of the Fifth and Fourteenth Amendments and Religious Freedom Restoration Act.

263.  Defendant Ian Connors in the position of National Inmate Appeals Administrator and therefore appointed representative for the Director of BOP, did not alert the appropriate administrators on the legitimate issues plaintiff raised in the Central Office Administrative Remedy Appeals (BP-11) and attached BP-A0822.  Defendant Connors's inaction denied plaintiff's sincere requests to be acknowledged and addressed with authority to resolve such issues the plaintiff raised.  Therefore, defendant Connors is responsible for violating plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments and under the Religious Freedom Restoration Act.

264.  Defendant Ian Connors, as the National Inmate Appeals Administrator, did not follow BOP's program statement PS542.17 that states "Coordinators…should be flexible, keeping in mind that the major purpose of the Program are [sic] solve problems and be responsive to issues inmates raise…. consideration should be given to accepting a Request or Appeal …even though that submission may be somewhat untimely."  Plaintiff's BP-11, in regard to religious dietary accommodations, is a legitimate issue and the reason given by plaintiff on second filing of BP-11 for re-filing, that per defendant Connors, made the BP-11 untimely was an issue that was unknown to the plaintiff at the time and was beyond plaintiff's control. Yet apparently it is a common issue due to the BOP mandated thermal printed address labels inmates pre-COVID-19 were required to use on all outgoing mail and are usually rendered unreadable by the security process for mail within areas of Washington, D.C.  Instead of considering that the original BP-11 might have been lost by the United States Postal Service USPS since plaintiff claims mailing through the USPS the original BP-11 to Central Office on June 12, 2016 and not getting a timely

response, the plaintiff re-filed the BP-11 on August 20, 2016, per suggested by Counselor

Bidwell after the prison facilities Administrative Remedy Coordinator, on behalf of plaintiff,

could not get a response on the status of the original BP-11 from defendant Connors.  Defendant

Connors's insistence that plaintiff must get institutional staff to provide proof of plaintiff's stated

reason for filing a second BP-11 before Defendant Connors would accept the BP-11, made it

impossible for the plaintiff to exhaust remedies.  In not acknowledging the issue raised in the

BP-11, Defendant Connors created a situation where the plaintiff's religious dietary situation

was unresolved and therefore the defendant is responsible for violating the plaintiff's religious

rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of the

Fifth and Fourteenth Amendments and under the Religious Freedom Restoration Act.

265.  Defendant Ian Connors, in the position of National Inmate Appeals Administrator and

therefore appointed representative for the Director of the BOP, did not alert the appropriate

administrators on the issues that plaintiff's BP-11 raises regarding BOP's failure to

accommodate the plaintiff's sincerely held religious dietary restrictions.  Defendant Connors's

inaction denied plaintiffs sincere request to be acknowledged and addressed by those with the

authority to resolve such issues. Therefore, defendant Connors is responsible for violating

plaintiff's religious rights under Free Exercise Clause of the First Amendment, Equal Protection

Clause of Fifth and Fourteenth Amendments and under the Religious Freedom Restoration Act.

266.  Defendant Kevin Kelley, as the Chief Chaplaincy Administrator, did not address the

various issues raised by plaintiff when a BP-A0822 filed on October 28, 2016, by plaintiff with

FCI Danbury's Supervisory Chaplaincy, Mr. Thompson, and was forwarded to defendant Kelley.

Due to defendant Kelley's inaction to address the BP-A0822, defendant Kelley prevented the

possibility of resolving the lack of religious accommodations for plaintiff's faith group, and

therefore defendant Kelley is responsible for violating plaintiff's religious rights under Free

Exercise Clause of First Amendment, Equal Protection clause of Fifth and Fourteenth

Amendments and under the Religious Freedom Restoration Act.

267.   Defendant Kevin Kelley, as the Chief Chaplaincy Administrator, created a Religious

Issues Committee on plaintiff's Holy Days request and while finding plaintiff's sincere,

defendant Kelley refused to accommodate such a request at the national level as done for other

faith groups, especially for the major faith groups (that of the occidentals) of the world (despite

the "Hindu" faiths being the world's third largest religious population and plaintiff's theistic

tradition representing over 70% of the "Hindu" faiths).  In doing so, defendant Kelley violated

the plaintiff's religious rights under Equal Protection Clause of Fifth and Fourteenth

Amendments and under the Religious Freedom Restoration Act.

268.   Defendant Kevin Kelley, as the Chief Chaplaincy Administrator, continues to choose

inaction in resolving plaintiff's faith group's lack of religious accommodation complaints and

requests spanning many years. He does so despite communications involving numerous lower-

level staff on the matter by such as Supervisory Chaplain Thompson, Staff Chaplain Gordish and

Acting Supervisory Chaplain Connors (these just at FCI Danbury), Administrative Remedies

filed by plaintiff and others of plaintiff's faith group throughout the BOP, as well as cases

brought to court through the years against the BOP and its employees by the plaintiff's faith

group on many of the issues the plaintiff raises herein.  Defendant Kelley's continued inaction to

accommodate plaintiff's faith group despite being made well aware of the issues, is cause for

defendant Kelley to be responsible for violating plaintiff's religious rights under Free Exercise

Claus of the First Amendment, Equal Protection Clause of the Firth and Fourteenth Amendments

and under the Religious Freedom Restoration Act.

269.  Defendant Kevin Kelley's, as the Chief Chaplaincy Administrator, failure to provide national level accommodations of plaintiff's faith group's Holy and Fast days, Religious Dietary Restrictions, Special Purchase Orders, faith group related commissary items, Personal Religious Property, etc., while accommodating other faith groups in such a manner in these matters, causes defendant Kelley to be responsible for violating plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

270.  Defendant Kevin Kelley, as the Chief Chaplaincy Administrator, and defendant Karen Stiltner, as the National Food Service Administrator in accommodating inmate Norwood's (Nation of Islam) faith group under the Certified Religious Diet component of the Alternative Diet Program, but not accommodating plaintiff and others of plaintiff's faith groups religious dietary restriction, which are a central tenet of plaintiff's faith, in a similar manner is discriminatory.  Furthermore, defendants Kelley and Stiltner instructed lower-level staff and inmates that there are only two non-modifiable components of the Alternative Diet Program and that the Certified Religious Diet component is based on Jewish dietary restrictions because the BOP program statement PS4700.04(2) stating that such dietary restriction is most restrictive of all faith groups and therefore covers all other faith group's dietary restrictions.  However, the accommodations by the BOP for inmate Michael Norwood, as well as plaintiff's and others of plaintiff's faith group's requests, complaints, and the issues being raised in multiple past court cases against the BOP on this matter, attest to the falseness of such claims and stance, yet still defendants Kelley and Stiltner continue to officially stand by such claims and stance. Defendants Kelley and Stiltner therefore refuse to accommodate the plaintiff's religious dietary restrictions that are a central tenet of the plaintiff's faith.  For these reasons, defendants Kelley

and Stiltner are responsible for violating the plaintiff's religious rights under the Free Exercise

Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth

Amendments and under the Religious Freedom Restoration Act.

271.  Defendant Kevin Kelley, as the Chief Chaplaincy Administrator was informed of the

BP-A0822 filed by plaintiff on May 24, 2019, to defendant Patricia Comstock and more copies

later with other relevant staff as well.  Through communication with Acting Supervisory

Chaplain Connors, defendant Kelley was informed of the ongoing situation and plaintiff's BP-

A0822 with attached requests, yet defendant Kelley took no action to properly address the matter

leaving the situation unresolved.  Therefore, this inaction causes defendant Kevin Kelley to be

responsible for violating the plaintiff's religious rights under the Free Exercise Clause of the

First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and under

Religious Freedom Restoration Act.

272.  Defendant Jane Doe, as the Regional Chaplaincy Administrator for the Northeast

Region instructed FCI Danbury Chaplaincy staff to deny plaintiff all requested accommodations

in opposition of United States law and the BOP program statements on such matters as plaintiff's

Holy Days (PS548.18), all the while without consulting with plaintiff's community faith group.

Therefore, defendant, Jane Doe's actions cause Jane Doe to be responsible for violating

plaintiff's religious rights under Free Exercise Clause of the First Amendment, Equal Protection

Clause of Fifth and Fourteenth Amendment, and under the Religious Freedom Restoration Act.

273.  Defendant Jane Doe, as the Regional Chaplaincy Administrator for the Northeast

Region, instructed FCI Danbury Supervisory Chaplain Thompson to remove plaintiff from the

Certified Religious Diet component with defendant Jane Doe stating that plaintiff should never

been given such accommodations since plaintiff is neither Jewish nor Muslim, despite inmate

Michael Norwood, who is of neither faith being accommodated officially under the CRD and is

housed at the same facility, FCI Danbury, as the plaintiff.  Defendant Jane Doe's actions

therefore cause defendant Jane Doe to be responsible for violating plaintiff's religious rights

under Free Exercise Clause of the First Amendment, Equal Protection Clause of Fifth and

Fourteenth Amendments and under the Religious Freedom Restoration Act.

274.  Defendant Jane Doe, as the Regional Chaplaincy Administrator for the Northeast

Region through communications with Acting Supervisory Chaplain Connors on the situation,

was informed of the BP-A0822 and the attached requests that plaintiff filed with defendant

Patricia Comstock on May 24, 2019, as well as more copies with other relevant staff.  Yet

defendant Jane Doe did not attempt to resolve the issues and therefore is responsible for violating

plaintiff's religious rights under Free Exercise Clause of the First Amendment, Equal Protection

Clause of the Fifth and Fourteenth Amendment and under the Religious Freedom Restoration

Act.

275.  Defendant Sean Marler, as the Acting Regional Director for the Northeast Region on

June 1, 2016, responded to plaintiff's Regional Administrative Remedy Appeal (BP-10)

regarding plaintiff's religious dietary accommodations request.  Defendant Marler stated plaintiff

was, "appropriately assigned to the mainline component of the religious diet based on your

[plaintiff] stated needs", despite the evidence to the contrary.  In denying and leaving the issue

unresolved, defendant Marler is responsible for violating plaintiff's religious rights under Free

Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth

Amendments, and under the Religious Freedom Restoration Act.

276.  Defendant John Doe, as the Regional Administrator Remedy Coordinator for the

Northeast Region, denied plaintiff's Regional Administrative Remedy Appeal (BP-10) regarding

the no response by FCI Danbury staff to both the BP-A0822 and then the BP-9, in opposition to

BOP's program statement PS542.18, as well as not notifying appropriate national level BOP

staff of the nature of plaintiff's complaint and request of the attached BP-A0822.  In denying the

plaintiff the ability to resolve the situation without having to seek further action at higher levels

in trying to resolve BOP's failure to accommodate plaintiff's religious beliefs and practices

defendant John Doe is responsible for violating plaintiff's religious rights under Free Exercise

Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth

Amendments, and under Religious Freedom Restoration Act.

277. Defendant Patricia Comstock, as one of two Assistant Wardens at FCI Danbury, failed to

respond to the BP-A0822 sent to her on May 24, 2019.  Defendant Comstock was sent the first

copy of the BP-A0822 on this date and then subsequently more copies were given to defendant

Comstock as attached to the Informal Resolution Form, as well as the Request for Administrative

Remedy (BP-9) with both items requesting that defendant Comstock respond to the BP-A0822.

Defendant Comstock's lack of a response to any of said requests, denied plaintiff the ability to

address BOP's continuing failure to accommodate plaintiff's sincerely held religious beliefs and

practices in an official manner as requested by defendant Comstock. Defendant Comstock is

therefore responsible for violating plaintiff's religious rights under the Free Exercise Clause of

the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and

under the Religious Freedom Restoration Act.

278. Defendant Patricia Comstock, as one of the two Assistant Wardens at FCI Danbury,

failed to respond to the Request for Administrative Remedy Appeal (BP-9) filed on October 15,

2019, after no response to the BP-A0822 for more than four months.  In failing to respond,

defendant Comstock violated BOP policy under Federal Statutes as well as denying the plaintiff

the ability to resolve BOP's failure to accommodate the plaintiffs sincerely held religious beliefs and practices.  Therefore, defendant Comstock is responsible for violating the plaintiff's sincerely held religious beliefs and practices and therefore plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

279.  Defendant Karen Stiltner, as the National Food Service Administrator refused to properly accommodate the plaintiff's "Hindu" faith's sincerely held religious dietary restrictions as is done for other faith groups, despite being a known issue for decades by defendant Bureau of Prisons and especially true for defendant Stiltner, who continues to uphold that the Alternate Diet Program (as is) is currently adequate, utilizing only the two prong model with the CRD prong operating under the umbrella of the Jewish religious dietary restrictions under the mistaken reasoning that such is capable of accommodating all faith groups dietary restrictions without any modifications despite strong evidence to the contrary.  Federal Court ruling many years ago in favor of inmate Michael Norwood, a current inmate in the BOP and who is neither of the Jewish nor Muslim faiths but instead of the Nation of Islam, ordered defendant Bureau of Prisons to provide Mr. Norwood a modified CRD that is Halal Vegetarian per Mr. Norwood's religious beliefs that are not mainstream Jewish nor Muslim.  This ruling proves the fallacy of the stance that the current Alternative Diet Program is adequate without modifications for all faith groups.  Yet, defendant Stiltner still refuses to acknowledge that the current Alternative Diet Program does not in fact cover all faith group's religious dietary restrictions and refuses to update the Alternative Diet Program to properly accommodate such faith groups as the plaintiff's faith group.  Therefore, defendant Karen Stiltner, is responsible for substantially burdening plaintiff's religious beliefs and practices, and in doing so is violating plaintiff's religious rights

under Free Exercise Clause of the First Amendment equal Protection Clause of the Fourteenth Amendments, and under the Religious Freedom Restoration Act.

280. Defendant Karen Stiltner, as the National Food Service Administrator knowing that the no-flesh component of mainline is lacto-ovo vegetarian at best and not vegan nor lacto-vegetarian, remains steadfast in stating that such a no-flesh option of mainline accommodates plaintiff's religious dietary restrictions despite documented evidence provided by plaintiff, plaintiff's faith group outside community, as well as by numerous other inmates of plaintiff's faith group.  The evidence provided explains that plaintiff's faith group requires a lacto-vegetarian diet and how it is not merely just lacto-vegetarian in nature.  Despite knowing this, defendant Stiltner's refusal to accommodate plaintiff's sincerely held religious dietary restrictions that are a central tenet of plaintiff's faith group's beliefs and practices while defendant Stiltner accommodates other faith groups, is discriminatory and substantially burdens plaintiff's religious beliefs and practices.  Therefore, defendant Stiltner is responsible for violating the plaintiff's religious rights under Free Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

281. Defendant Karen Stiltner, as the National Food Service Administrator failed to address, through a Religious Issues Committee involving defendants Kevin Kelley and Mitchel Holliday, the issues raised by plaintiff of the defendant Bureau of Prisons to accommodate plaintiff's religious beliefs and practices through addressing the failings of the current Alternative Dietary Program, Transit Dietary Protocol, Special Purchase Order for religious food items and regular commissary supplemental items as is accommodated for other faith groups.  Defendant Stiltner, in choosing not to act to resolve these issues is therefore responsible for violating the plaintiff's

religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause

of the Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

282.  Defendant Mitchel Holliday, as the Chief Dietician of the BOP, chose to listen to FCI

Danbury's Assistant Food Service Administrator, Mrs. McGetigan, in April 2017, without

checking why Mrs. McGetigan ignored the chain of command.  In doing so and without

consulting FCI Danbury's Chaplaincy staff as well as not consulting with plaintiff's faith group

outside community, defendant Holliday ordered institutional Food Services and Chaplaincy

Services staff to remove plaintiff from the Certified Religious Diet because, per defendant

Holliday, the Certified Religious Diet component is not for plaintiff's faith group.  In taking such

actions, defendant Mitchel Holliday substantially burdened the plaintiff's religious beliefs and

practices, and therefore is responsible for violating plaintiff's religious rights under the Free

Exercise Clause of the First Amendment, Equal Protection Clause of Fifth and Fourteenth

Amendments, and under the Religious Freedom Restoration Act.

283.  Defendant Mitchel Holliday, as the Chief Dietician of the BOP, chose to again listen to

FCI Danbury's Assistant Food Services Administrator, Mrs. McGetigan, without consulting with

FCI Danbury's Administrative staff, Chaplaincy staff, nor Food Services Administrator Mr.

Rogers, as well as not consulting with plaintiff's outside community faith group.  In opposition

of FSA Rogers and Assistant Warden Pollard, defendant Holliday instructs AFSA McGetigan

that plaintiff was not to be accommodated with a modified version of BOP's Fast Bag Meals.

Defendant Holliday stated the reason for denial is that such an accommodation was not

nutritional, and that plaintiff is to self-select from mainline, despite documented evidence

provided by plaintiff and plaintiff's outside community faith group showing such option of self-

select from mainline is not a viable option for plaintiff per plaintiff's sincerely held religious

dietary restrictions.  Defendant Holliday ignored the fact that defendant Bureau of Prisons accommodates, per defendant Holliday's approval and per BOP program statement PS4700.06, similar Fast Bag Meals for other faith groups such Fast Bags are therefore deemed nutritionally adequate.  Therefore, defendant Holliday is responsible for violating plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

284.  Defendant Mitchel Holliday, as the Chief Dietician of the BOP, stated in a teleconference with the plaintiff that he is aware that the current Alternate Diet Program is inadequate to meet plaintiff's religious dietary restrictions, yet defendant Holliday's repeated inaction to address the ongoing situation with defendants Karen Stiltner and Kevin Kelley, despite knowing the problems, cause defendant Holliday to be responsible for violating plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal Protection Clause of the Fifth and Fourteenth Amendments, and under the Religious Freedom Restoration Act.

285.  Defendant Mitchel Holliday, as the Chief Dietician of the BOP, worked with defendant Karen Stiltner's and defendant Kevin Kelley's predecessor, Heidi Kugler, as well as defendant Kevin Kelley, who was at the time directly under Heidi Kugler, to accommodate inmate Michael Norwood of the Nation of Islam faith group with a Halal Vegetarian Certified Religious Diet, yet years later refuses to work with defendants Kelley and Stiltner to accommodate plaintiff's sincerely held religious dietary restriction that are a central tenet of plaintiff's faith groups.  Such behavior is discriminatory and therefore defendant Mitchel Holliday is responsible for violating plaintiff's religious rights under the Free Exercise Clause of the First Amendment, Equal

Protection Clause of the Fifth and Fourteenth Amendments and under the Religious Freedom

Restoration Act.

**Equal Protection Clause of Fifth and Fourteenth Amendments,
and Under the Religious Freedom Restoration Act.**

**VII. Relief Requested**

WHEREFORE, plaintiff requests that the court grant the following relief:

A.   Issue a declaratory judgement stating that:

1.   The defendants: Bureau of Prisons, Michael Carvajal, Kevin Kelley, and Jane Doe

continued use of the geographical term "Hindu" to group very distinct theistic traditions as

one group is erroneous and has no theistic basis.

2.   The defendants: Bureau of Prisons, Michael Carvajal, Kevin Kelley, Jane Doe

continued use of the term "Hindu" to define them not as how followers of a majority of such

theistic traditions define their own beliefs and practices, but instead by imperialistic non-

followers titling and grouping erroneously such theistic traditions they clearly do not understand

is problematic in matters dealing with prisoners of these very distinct theistic traditions.

3.   The Alternate Diet Program currently is unable to accommodate plaintiff's religious

dietary restrictions.

4.   The no-flesh, self-select option of the Alternate Diet Program and the instruction to

utilize commissary to supplement such a diet is not a proper solution that accommodates

plaintiff's sincerely held religious dietary restrictions.

5.   The current two allotted holy days and no fast days accommodated at BOP National level

is inadequate in comparison of outside community-based documentation verifying plaintiff's

requests, and when reviewing the amount of Holy and Fast Days of other faith groups who are

accommodated at the National level of the BOP, and that such exceed in many cases the amount plaintiff has requested.

6. The Holy Days and Fast Days requested by plaintiff are important, required observance days of followers of plaintiff's faith and for spiritual development these days are to be observed without mundane, worldly distractions of work and other non-spiritual activities and therefore are defined, per defendant Bureau of Prisons definition, as work proscription days and therefore should be accommodated as such as done for other faith groups observances of similar nature.

7. Defendant Patricia Comstock, in not allowing plaintiff to have an altar set up despite plaintiff's sincerely held beliefs and practices that require said altar, is a violation of plaintiff's religious rights.

8. Defendants not allowing plaintiff religious items that are central to plaintiff's faith while accommodating other faith groups with similar accommodations, is a violation of plaintiff's religious rights.

9. Defendants' failure to properly address plaintiff's numerous requests and complaints involving plaintiff's sincerely held religious beliefs and practices continued the violations upon plaintiff's religious rights.

B. Issue an injunction ordering defendants Michael Carvajal and Kevin Kelley to:

1. Address at the National Bureau of Prisons level how best to separate the "Hindu" faith group classification to resolve plaintiff's complaint that the current grouping and classification defendant Bureau of Prisons utilizes is incorrect and problematic due to very distinct theistic traditions grouped erroneously under a geographical term by 19th Century British Imperialist outsiders of those faiths.

C. Issue an injunction ordering defendant Kevin Kelley to:

1.  Resolve accommodating plaintiff's faith group's Holy Days and Fast Days requested by plaintiff as work proscription days as done for other faith groups per defendant Bureau of Prisons Policy P548.18.

2.  Resolve at the National Bureau of Prisons level through policy statements and other National means, plaintiff's request for accommodations for a personal altar that accommodates plaintiff's faith group's beliefs and practices by the least restrictive means while satisfying legitimate penological interests of security and hygienic standards.

3.  Resolve at the National Bureau of Prisons level through updating of program statement PS407 Religious Items along with other National means, plaintiff's request for the ability to acquire and possess as personal inmate property religious items central to the beliefs and practices of plaintiff's faith group as stated in plaintiff's BP-A0822.

4.  Resolve at the National Bureau of Prisons level through updating of program statements and other National means address plaintiff's faith group's restrictions on wearing anything made of leather including but not limited to providing a non-leather substitute for the current standard BOP-issued work boots and inmate commissary personal footwear.

5.  Resolve at the National Bureau of Prisons level through updating of program statements and other National means accommodating as central tenets of plaintiff's faith group the allowance of wearing Tilak, Kunti mala and Brahmanical threads at all times within the prison institution and during transit as per plaintiff's faith groups religious beliefs and practices.

D.  Issue an injunction ordering defendants Kevin Kelley, Karen Stiltner, and Mitchel Holliday to:

1.  Resolve at the National Bureau of Prisons level through updating of the program statements including the Alternate Diet Program, the Satellite Meal Service, Satellite Meal

Selection, Alternative Menu Contents and Transport Meals program statements and other National BOP Statements to accommodate plaintiff's faith group's religious dietary restrictions as done by defendants for other faith groups.

    2.  Resolve at the National Bureau of Prisons level through updating of program statements such as P4500.11 "Items to be sold in the commissary", and by other National means to accommodate plaintiff's requests per plaintiff's cover letter to plaintiff's BP-A0822 as done for other faith groups.

E.  Grant such other relief as it may appear that plaintiff is entitled.

Respectfully Submitted,

*David Burkman*

David W. Burkman, 40422-013
Federal Correctional Institution Danbury
Route 37
Danbury, CT  06811



7015 0920 0001 4524 3641

stamps
endicia

US POSTAGE PAID FEES PAID
PRIORITY MAIL
Dec 08 2021
Mailed from ZIP 71111
2 lb 8oz Zone 6

U0682053
Commercial Plus Pricing 062S0011272735

PRIORITY MAIL 2-DAY    C003  00004

Shipped using PostalMate
Pkg 2101261

Packages Plus
Keith Cockerham
2183 Airline Dr
BOSSIER CITY LA 71111

RETURN RECEIPT REQUESTED

SHIP TO:
US DISTRICT FOR DISTICK OF COLUMBIA
ATTN: CLERK OF COURT
333 CONSTITUTION AVE  NW
ROOM 1225
WASHINGTON DC 20001-2802

USPS CERTIFIED MAIL

9402 7111 0803 6830 3481 21

Burkman

6219 E Texas St #100

Bossier City LA 71111